IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

| | | |
|---|---|---|
| **In re:** | ) | |
| | ) | |
| **STEPHEN BRADLEY HALFERTY,** | ) | **Case No. 22-00101-05-DMW** |
| | ) | **Chapter 13** |
| **Debtor.** | ) | |
| | ) | |
| | ) | |
| **EVER-SEAL, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Adv. Proc. No.** 22-00050-5-DMW |
| **v.** | ) | |
| | ) | |
| **STEPHEN BRADLEY HALFERTY d/b/a DURASEAL,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff Ever-Seal, Inc. ("Ever-Seal") submits this Memorandum in Support of its Motion for Preliminary Injunction against Defendant Stephen Bradley Halferty ("Halferty"), who is doing business as DuraSeal. As Ever-Seal's busiest season quickly approaches this Spring, when Ever-Seal's sales historically increase tenfold from approximately $100,000 per month in December, January, and February to over $1,000,000 per month in March, April, and May, Ever-Seal seeks this preliminary injunction to prevent Halferty from committing (1) further breaches of his Confidentiality Agreement and (2) further intentional interference with Ever-Seal's business relations.

## I. INTRODUCTION

Ever-Seal recently learned that Halferty, its former estimator and sales manager, is competing directly against Ever-Seal for business, and has been competing directly against Ever-

Seal for business since months before his termination. Halferty's conduct includes surreptitiously stealing prospective clients and usurping business opportunities for his own personal benefit through various forms of lies, deceit, self-promotion, and underhanded tactics, and utilizing Ever-Seal's confidential and inside information, as well as employees, in order to do so. Halferty's competition breaches his Confidentiality Agreement with Ever-Seal, including both its non-competition and its confidentiality clauses. (Copy of fully executed agreement attached as **Exhibit A** to Verified Complaint). And it intentionally and tortiously interferes with Ever-Seal's prospective business relations with customers. The resulting harm to Ever-Seal's goodwill and prospective customer relationships and business opportunities is ongoing and irreparable.[1] Given the irreparable nature of the harm and the fact that Ever-Seal's busiest season is quickly approaching, Ever-Seal seeks immediate injunctive relief prohibiting Halferty from competing against Ever-Seal.

## II. FACTUAL BACKGROUND[2]

Ever-Seal provides wood and concrete restoration and permanent sealing services to individuals and businesses throughout the Southeastern United States, including service areas in Alabama, Georgia, Indiana, North Carolina, South Carolina, Kentucky, Tennessee, and Virginia. Ver. Compl. ¶¶ 10. To provide these services, Ever-Seal utilizes a product called Seal-It. *Id.* at

[1] As even Halferty's counsel acknowledged in open court, "if it was true that my client was actively stealing clients or leads, that would be a very serious matter" and "clearly DuraSeal shouldn't be stealing things from EverSeal. We all agree that that would be wrong and that would be improper." Ex. B, Hrg. Tr. 13:10-12, 41:16-18.

[2] The facts at issue in this case are set forth more fully in Ever-Seal's Verified Complaint. Accordingly, Ever-Seal will not endeavor to restate these facts in full here, and generally relies on the facts alleged in its Verified Complaint.

¶¶ 17-18. Ever-Seal is one of only five companies in the United States authorized to offer and install manufacturer-warranted Seal-It. *Id.* at ¶ 19.

In May 2020, Ever-Seal engaged Halferty as an estimator for its sales territory in North Carolina. *Id.* at ¶ 22. At the commencement of his working relationship with Ever-Seal, Halferty executed a Confidentiality Agreement with Ever-Seal. *Id.* at ¶ 36; Ver. Compl. Ex. A. The Confidentiality Agreement prevents Halferty's unauthorized use, disclosure, and dissemination of Ever-Seal's Confidential Information and Materials during his working relationship with Ever-Seal and for a period of two years thereafter ("Confidentiality Clause") and prohibits Halferty from competing against Ever-Seal for a period of two years following his termination ("Non-Compete Clause"). Ver. Compl. Ex. A ¶¶ 1-5.

Specifically, the Confidentiality Clause provides:

> Each party acknowledges it is being provided the aforesaid Confidential Information and Materials in a fiduciary capacity in connection with the Transaction and that the Confidentiality Information and Materials are and will be of a secret, proprietary, and confidential nature. Each party further acknowledges that, except as otherwise provided herein, during the term of the Transaction and for a period of two years thereafter, it will never, directly or indirectly, use, disseminate, disclose or other wise divulge any Confidential Information or Confidential Material. Further, each party shall prevent any unauthorized disclosure of Confidential Information or Confidential Materials by its employees, agents or independent contractors. … Recipient shall use any Confidential Information and Materials received solely in connection with the Transaction.

*Id.* at ¶¶ 3, 5. "Confidential Information" is defined as "information disclosed by [Ever-Seal] to [Halferty], or its agents, employees and/or independent contractors, in any manner, that is not generally known in the industry in which [Ever-Seal] is engaged, about its business and which [Ever-Seal] desires to be kept confidential." *Id.* at ¶ 1. Confidential Information includes, for example, "operating procedures and results, customer information, … software programs,

marketing plans and strategies, … trade secrets, know-how and ideas." *Id.* "Confidential Materials" is "all physical embodiments of Confidential Information[.]" *Id.* at ¶ 2.

The Non-Compete Clause provides:

> Furthermore, employees, contractors, or associates of Ever-seal Inc., upon voluntary or involuntary termination of employment or contract, agree to not enter employment or contract with, nor advise, another company or business entity that is in direct or indirect competition with Ever-Seal Inc. or any of its entities for the same two-year period thereafter.

*Id.* at ¶ 3.

The Confidentiality Agreement further provides:

> The parties agree that compliance with the terms of this Agreement is necessary to protect the business and good will of each party. Further, the parties agree that a breach of this Agreement will irreparably and continually damage the other and that an award of money damages will not be adequate to remedy such harm. Therefore, the parties agree that each shall be entitled to both a preliminary and/or permanent injunction in order to prevent the continuation of such harm as well as an award of money damages, insofar as they can be determined, including, without limitation, all reasonable costs and attorney's fees incurred in enforcing the provisions of this Agreement.

*Id.* at ¶ 9.

At the time he was engaged by Ever-Seal, Halferty had no prior experience in the concrete and wood sealing industry. Ver. Compl. ¶ 25. Ever-Seal trained Halferty on its specialized techniques and processes in permanently sealing wood and concrete, applying its permanent sealing solution, and giving its unique sales presentation. *Id.* at ¶¶ 26-27. In his role as estimator, Halferty was responsible for attending sales appointments assigned to him by Ever-Seal, testing surfaces, measuring projects and preparing bids, utilizing Ever-Seal's presentation materials and samples to sell Ever-Seal's services to prospective customers, answering prospective customer questions, and completing new customer paperwork. *Id.* at ¶ 23. In late 2020, Halferty was promoted to sales manager, a role in which he was responsible for assisting sales representatives

in each market area at the direction of Ever-Seal management and per Ever-Seal standards meanwhile continuing to oversee his assigned territory in Raleigh, North Carolina. *Id.* at ¶¶ 29-30. Halferty's duties as sales manager included reviewing each sale as it came in to ensure accuracy before forwarding it to the operations manager, training and working with sales team members in the different sales territories, and responding to customer complaints and resolution plans pertaining to estimates. *Id.* at ¶ 31. In his role as sales manager, Halferty learned Ever-Seal's larger marketing and growth plans and strategies, as well as Ever-Seal's methods to provide services efficiently, reliably, and at an affordable price. *Id.* at ¶ 33.

In both of these roles, Halferty was responsible for communicating directly with prospective customers on behalf of Ever-Seal in order to secure new customer relationships and business for Ever-Seal, and he was privy to Ever-Seal's private information on leads, customer inquiries, bids, and appointments. *Id.* at ¶¶ 23-24, 30, 35. Halferty served as the prospective customer's main point of contact at all times between the initial sales appointment and the customer entering into a contract with Ever-Seal. *See id.* at ¶ 23-24. In these roles, Ever-Seal provided Halferty with access to its Confidential Information and Materials, including but not limited to: Ever-Seal's unique processes and methods for permanently sealing wood and concrete; Ever-Seal's customer and prospective customer databases; Ever-Seal's information on Ever-Seal leads, inquiries, and prospective business opportunities and customer relationships; Ever-Seal's marketing strategies and plans; Ever-Seal's growth strategy and plans; Ever-Seal's methods for providing services efficiently and at an affordable price; Ever-Seal's approach to prospective customer relationships and selling permanent sealing services; Ever-Seal's confidential and proprietary sales presentation book; Ever-Seal's internal forms, documents, and processes for securing new business and ensuring customer satisfaction; and Ever-Seal's unique and proprietary

truck design and functionality. *Id.* at ¶ 43; *see also id.* at ¶¶ 39-40 (defining Confidential Information and Confidential Materials as used in Confidentiality Agreement). Such information and materials are not publicly known or readily available.

In November 2021, Ever-Seal terminated its relationship with Halferty due to Halfery failing to show up to scheduled appointments with customers. *Id.* at ¶ 44. It was not until late December 2021 and early January 2022 that Ever-Seal learned that, since his termination from Ever-Seal, and indeed prior to his termination from Ever-Seal, Halferty has been working for or through a company called DuraSeal. *Id.* at ¶¶ 47-49.[3] Upon information and belief, Halferty formed DuraSeal in or around June 2021 to compete against Ever-Seal. *Id.* at ¶¶ 47-49.[4] DuraSeal, like Ever-Seal, provides permanent sealing services for wood and concrete backed by a 25-year warranty. *Id.* at. ¶ 50; Ex. A, Lucero Decl. ¶ 14.[5][6] DuraSeal, like Ever-Seal, utilizes Seal-It for its services. Ver. Compl. ¶ 51; Ex. A, Lucero Decl. ¶ 14.[7] DuraSeal, like Ever-Seal, operates in at least North Carolina and South Carolina. Ver. Compl. ¶ 52; Ex. A, Lucero Decl. ¶ 13.[8] DuraSeal competes directly against Ever-Seal by submitting bids on the same projects, marketing in the same areas, and offering the same permanent sealing services utilizing the same product,

[3] Halferty admitted under oath that he began DuraSeal while he was still working for Ever-Seal and that he solicited sales on behalf of both companies from June 2021 to November 2021. Ex. B, Hrg. Tr. 21:15-21.

[4] Halferty testified under oath that he is the owner and operator of DuraSeal and that he started DuraSeal in June 2021. Ex. B, Hrg. Tr. 19:23-20:1.

[5] The Declaration of Tim Lucero is attached hereto and incorporated herein Exhibit A.

[6] Halferty admitted this fact. Ex. B, Hrg. Tr. 30:3-13.

[7] Halferty admitted this fact. Ex. B, Hrg. Tr. 28:22-29:3.

[8] Halferty admitted this fact. Ex. B, Hrg. Tr. 24:21-24.

processes, and representations. Ver. Compl. ¶¶ 50-60; Ex. A, Lucero Decl. ¶¶ 8-11, 13-17. Halferty, through DuraSeal, is further using Ever-Seal's Confidential Information and Materials to compete against Ever-Seal. Ver. Compl. ¶¶ 60-61; Ex. A, Lucero Decl. ¶¶ 8-11, 14, 17-18. Halferty has engaged in such conduct by and through DuraSeal, both before and after he commenced his Chapter 13 case. *See* Ex. B, Hrg. Tr. 19:23-20:3 (admitting he began DuraSeal in June 2021 and continues to operate DuraSeal now).[9]

Halferty's conduct has damaged and is continuing to damage Ever-Seal in the form of lost business, customer relationships, and goodwill, as well as lost profits and administrative, marketing, recruiting, and training costs. Ver. Compl. ¶¶ 65-72, 87-88, 103-104. To date, Halferty has sourced at least 12 separate jobs directly from Ever-Seal, and he is continuing to advertise and sell DuraSeal's competing services in at least North Carolina and South Carolina. *Id.* at ¶ 69; Ex. A, Lucero Decl. ¶ 13.[10]

## III. STANDARD

The purpose of a preliminary injunction is to preserve the relative positions of the parties and prevent irreparable harm until a trial on the merits can be held. *United States v. South Carolina*, 720 F.3d 518, 524 (4th Cir. 2013) (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). To obtain a preliminary injunction, the moving party must make a clear showing that: (1)

[9] A true and accurate copy of the Transcript of the February 23, 2022 hearing on Ever-Seal's Emergency Motion for Relief from Stay is attached hereto and incorporated herein Exhibit B.

[10] Halferty testified that he personally sold $13,000 worth of work for DuraSeal while he was still working for Ever-Seal and that there was at least one other DuraSeal representative selling at the same time. Ex. B, Hrg. Tr. 23:2-7. Halferty testified that DuraSeal did approximately $400,000 in gross revenue in 2021. *Id.* at 29:25-30:2. Halferty further testified that DuraSeal currently has at least 20 to 25 jobs lined up and DuraSeal is actively soliciting business today. *Id.* at 24:6-9, 35:19-22. Ever-Seal would argue that all of these sales should have gone to Ever-Seal (and would have but for Halferty's misconduct) such that Halferty's testimony provides further evidence of damage to Ever-Seal, although the extent of the damage is unknown at this time.

it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in favor of the moving party; and (4) an injunction is in the public interest. *In re B6USA, Inc.*, 560 B.R. 179, 183 (Bankr. E.D.N.C. 2016) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

Given its limited purpose, a preliminary injunction is customarily granted "on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *NovaQuest Cap. Mgmt., L.L.C. v. Bullard*, 498 F. Supp. 3d 820, 830 (E.D.N.C. 2020) (quoting *Camenisch*, 451 U.S. at 395). "'A party thus is not required to prove his case in full at a preliminary-injunction hearing,' and the findings of fact and conclusions of law made by a court in ruling on a preliminary injunction are not binding at trial on the merits.'" *Id.* (quoting *Camenisch*, 451 U.S. at 395).

## IV. ARGUMENT

In the present case, all four elements are satisfied such that a preliminary injunction is warranted in order to prevent further unlawful competition by Halferty and to protect Ever-Seal's business, customer relations, and goodwill during the pendency of this lawsuit.

### A. Ever-Seal Has Strong Likelihood of Success on the Merits

To establish a likelihood of success on the merits, a plaintiff. must "make a clear showing that [it is] likely to succeed at trial" but "need not establish a certainty of success." *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020), as amended (Jan. 14, 2020) (citations and quotations omitted).

#### 1. Breach of Contract[11]

[11] Tennessee law governs Ever-Seal's breach of contract claim because the Confidentiality Agreement includes a choice of law provision providing for the application of Tennessee law. Ver. Compl. Ex. A, at ¶ 9 ("This Agreement and the validity, interpretation, performance and

Ever-Seal's breach of contract claim requires that Ever-Seal show the existence of a valid and enforceable contract, a deficiency in the performance of said contract amounting to a breach, and damages caused by the breach. *See Fed. Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011). Ever-Seal can establish each of these elements such that Ever-Seal is likely to succeed on its breach of contract claim against Halferty.

**i. Halferty entered into a valid and enforceable Confidentiality Agreement with Ever-Seal.**

At the commencement of his working relationship with Ever-Seal, Halferty knowingly and voluntarily entered into a written Confidentiality Agreement with Ever-Seal. *See* **Exhibit A** to Verified Complaint. That agreement protects Ever-Seal's confidential information and includes a non-competition clause that prohibits Halferty from entering into any employment, contractual, or advisory relationship with any business entity that is in direct or indirect competition with Ever-Seal for a period of two years following his termination from Ever-Seal. *Id.* at ¶¶ 1-5. This Confidentiality Agreement is enforceable under Tennessee law.

---

enforcement hereof shall be governed by the domestic laws of the State of Tennessee without giving effect to the principles of conflicts of laws thereof."). North Carolina choice-of-law rules generally give effect to such provisions. *Bueltel v. Lumber Mut. Ins. Co.*, 134 N.C.App. 626, 631, 518 S.E.2d 205 (1999) (citing *Tanglewood Land Co., Inc. v. Byrd*, 299 N.C. 260, 262, 261 S.E.2d 655, 656 (1980)) (""where parties to a contract have agreed that a given jurisdiction's substantive law shall govern the interpretation of the contract, such a contractual provision will be given effect."). *See also Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co., Inc.*, 386 F.3d 581, 602 (4th Cir. 2004) ("Despite North Carolina's adherence to the presumptive rule of lex loci contractus, contracting parties in North Carolina are entitled to agree that a particular jurisdiction's substantive law will govern their contract, and such a provision will generally be given effect."). There is no reason to depart from that rule here.

*The Non-Compete Clause is Enforceable*

Under Tennessee law, a non-competition covenant is enforceable if the employer has a protectable business interest and the covenant is "reasonable under the circumstances." *Vantage Technology, LLC v. Cross*, 17 S.W.3d 637, 644 (Tenn. Ct. App. 1999) (citing *Hasty v. Rent-A-Driver, Inc.*, 671 S.W.2d 471, 472-73 (Tenn. 1984)). In addition, the scope of the non-compete covenant must be reasonable in that "the time and territorial limits involved must be no greater than is necessary to protect the business interests of the employer." *Allright Auto Parks, Inc. v. Berry*, 219 Tenn. 280, 409 S.W.2d 361, 363 (1966).[12]

An employer has a protectable business interest if there are "special facts … over and above ordinary competition … such that without the covenant, the employee would gain an unfair advantage in future competition with the employer." *Hasty*, 671 S.W.2d at 473. Relevant considerations in determining whether an employee would have such an unfair advantage include:

> (1) whether the employer provided the employee with specialized training; (2) whether the employee is given access to trade or business secrets or other confidential information; and (3) whether the employer's customers tend to associate the employer's business with the employee due to the employee's repeated contacts with the customers on behalf of the employer.

*Vantage*, 17 S.W.3d at 644 ("[t]hese considerations may operate individually or in tandem to give rise to a properly protectable business interest").

[12] To be clear, non-compete covenants are equally applicable to independent contractor relationships and the same analysis applies. *See Baker v. Hooper*, No. 03A01-9707-CV-00280, 1998 WL 608285, at *3-4 (Tenn. Ct. App. Aug. 6, 1998). Therefore, whether Halferty was an employee or independent contractor is irrelevant to the present analysis. *See Thuy-T-Lam v. Tuan Ngoc Bui Le*, No. E200802491COAR3CV, 2009 WL 2047290, at *4 n.3 (Tenn. Ct. App. July 15, 2009) ("Although the nail technicians were technically independent contractors and not employees, this distinction has no bearing on the present matter.").

Ever-Seal had a protectable business interest in the parties' non-compete over and above ordinary competition. As discussed in the Verified Complaint, Ever-Seal trained Halferty on its specialized processes and techniques in permanently sealing wood and concrete and applying its sealing solution. Ver. Compl. ¶¶ 26-27.[13] Halferty had no prior training or experience in the wood and concrete treatment and sealing business. Ver. Compl. ¶ 25. Ever-Seal further provided Halferty access to its confidential and inside information, including but not limited to information on Ever-Seal leads, inquiries, and prospective business opportunities and customer relationships, Ever-Seal's marketing and growth strategies, and Ever-Seal's confidential and proprietary sales process and presentation book. Ver. Compl. ¶ 43. As such, Halferty had a level of knowledge not publicly known or readily available that was learned as a consequence of his work with Ever-Seal. In addition, Halferty, as a salesperson (and sales manager) on behalf of Ever-Seal, was the "face" of Ever-Seal to potential customers. He was many potential customers' primary point of contact and privy to private information about each such customer and project, including but not limited to the customer's needs, wants, likes, and dislikes, and Ever-Seal's private bid information. Ver. Compl. ¶¶ 23-24, 30-31, 32, 35. He was also the point of contact for future business from potential customers. *See id*. at ¶ 23-24. Armed with this specialized training, knowledge, and relationships, Halferty would undoubtedly gain an unfair advantage in future competition with Ever-Seal such that Ever-Seal clearly had a protectable business interest.

Once a protectable business interest is established, the Court must decide whether the non-compete covenant is "reasonable under the circumstances." *Vantage*, 17 S.W.3d at 644, 647. To

[13] Indeed, Halferty touts on the DuraSeal website that "there are only a handful of authorized applicators that have the training and specialized equipment required to apply the product correctly to achieve such long-lasting results." Ex. B, Hrg. Tr. 33:23-35:4.

do so, it balances the threatened danger to the employer's protectable interest in the absence of a non-competition covenant, the economic hardship imposed on the employee, and whether or not the covenant harms the public interest. *Id.* (citing *Allright Auto Parks, Inc. v. Berry*, 219 Tenn. 280, 409 S.W.2d 361, 363 (1966)).[14]

Here, the non-compete is reasonable under the circumstances. If the covenant is not enforced, Ever-Seal stands to lose its investment in training Halferty, its investment in the development of customer relationships, its effort expended in gathering information concerning customer preferences, its goodwill, and its prospective business and customer relationships. If the covenant is enforced, Halferty can still work as a salesperson or estimator for any other non-competing company, and he merely loses that which does not belong to him. The threatened danger to Ever-Seal in the absence of enforcement outweighs the economic hardship imposed upon Halferty by enforcement of the non-competition covenant. In addition, the public interest does not militate against enforcement of the covenant; to set the covenant aside would allow Halferty to use unfairly the benefits bestowed upon him by his principal and may result in a disincentive for Ever-Seal to properly train and inform its salespersons, which is not in the public interest. Upon consideration of the relevant factors and circumstances, the non-compete agreement reasonable.

Finally, the scope of the parties' non-compete agreement is reasonable. The temporal limitation is two years. Ver. Compl. Ex. A ¶ 3. This is a reasonable amount of time under the circumstances, and Tennessee courts regularly enforce restrictions with two-year scopes. *See*

---

[14] The Court also looks at the consideration supporting the non-compete covenant. *Id.* at 644. Here, there was adequate consideration supporting the non-compete because it was executed contemporaneously with the commencement of Halferty's working relationship with Ever-Seal. *Cent. Adjustment Bureau, Inc. v. Ingram*, 678 S.W.2d 28, 33 (Tenn. 1984) (holding future employment of at-will employee constitutes adequate consideration for non-compete covenant where covenant signed prior to, contemporaneously with, or shortly after employment begins).

*Total Car Franchising Corp. v. L & S Paint Works, Inc.*, 981 F. Supp. 1079, 1082 (M.D. Tenn. 1997) (finding two-year time limitation reasonable noting "covenants lasting for two to five years have all been found to be of reasonable duration"); *Powell v. McDonnell Ins., Inc.*, No. 02A01-9608-CH-00176, 1997 WL 589232, at *6-7 (Tenn. Ct. App. Sept. 24, 1997) (reversing trial court's reduction of non-compete time limitation from two years to one year; collecting cases that two-year duration reasonable).[15] Under controlling law, this time period should be tolled while the breach is ongoing. *Corp. Exp. Off. Prod. v. Warren*, No. 01-2521 DBRE, 2002 WL 1901902, at *17 (W.D. Tenn. May 24, 2002) ("The Court … finds that the covenant not to compete is tolled effective the date on which Fisher began competing with Corporate Express. Fisher originally agreed not to compete with Corporate Express for a twelve month period of time and Defendants have not offered any reason why Fisher should not be held to the terms of this covenant.").

Here the geographic scope of the parties' non-compete agreement is reasonable given the unique product and services offered by Ever-Seal, even though it is unlimited. *See, e.g., Dabora, Inc. v. Kline*, 884 S.W.2d 475, 478 (Tenn. Ct. App. 1994) (geographic restriction that prohibited employees from working with employer's competitors in entire U.S. for three years was reasonable under circumstances given employer's limited scope of business). Ever-Seal is one of only five companies in the United States authorized to offer and install manufacturer-warranted Seal-It. Ver. Compl. ¶ 19. Therefore, the restriction on Halferty's competition is fairly narrow in application

[15] Under Tennessee law, the fact that Halferty worked for Ever-Seal for 18 months does not render the two year time limitation unreasonable, nor should it allow Halferty to go back on his voluntarily assumed promises supported by adequate consideration. *See, e.g., Dill v. Cont'l Car Club, Inc.*, No. E2013-00170-COA-R3CV, 2013 WL 5874713, at *15, 17 (Tenn. Ct. App. Oct. 31, 2013) (two-year limitation on non-compete reasonable even though defendant worked for only 14 months); *Flying Colors of Nashville, Inc. v. Keyt*, No. 01-A-019103CH00088, 1991 WL 153198, at *4 (Tenn. Ct. App. Aug. 14, 1991) (one-year limitation reasonable even though defendant worked for only six months).

because it prevents him from associating with only a handful of competing companies. *See generally Thompson, Breeding, Dunn, Creswell & Sparks v. Bowlin*, 765 S.W.2d 743, 745-76 (Tenn. Ct. App. 1987) (explaining need for geographical limitation decreases as limitation regarding class of persons with whom competition is prohibited increases); *Interstate S. Packaging, LLC v. Korman*, No. 2:20-CV-207, 2021 WL 5161910, at *12 (E.D. Tenn. Sept. 5, 2021) ("When considering whether a noncompete is reasonable, the geographic breadth of the provision must be read in conjunction with the scope of activities prohibited over a given area."). The scope is further appropriate under the circumstances given that Halferty, in his role as sales manager, assisted in each of Ever-Seal's market areas. Ver. Compl. ¶¶ 30-32. Under these circumstances, the geographic scope is reasonable. At a minimum it should include every state in which Ever-Seal does business, which presently includes Alabama, Georgia, Indiana, North Carolina, South Carolina, Kentucky, Tennessee, and Virginia. Halferty has no right to unfairly compete with Ever-Seal wherever it does business.

*The Confidentiality Clause is Enforceable*

Under Tennessee law, "confidential business information is only protectible to the extent that it qualifies as a trade secret." *Hickory Specialties, Inc. v. Forest Flavors Int'l, Inc.*, 26 F. Supp. 2d 1029, 1031 (M.D. Tenn. 1998), *aff'd*, 215 F.3d 1326 (6th Cir. 2000). Tennessee courts define a trade secret to mean "any formula, process, pattern, device or compilation of information that is used in one's business and which gives him an opportunity to obtain an advantage over competitors who do not use it." *Data Processing Equip. Corp. v. Martin*, 1987 WL 30155, at *4 (Tenn. Ct. App. Dec. 30, 1987) (citing *Hickory Specialties*). Tennessee courts enforce confidentiality clauses "to the extent that the information in question actually is (1) secret, (2)

business related, and (3) afforded the employer a competitive advantage." *Hickory Specialties*, 26 F. Supp. 2d 1029 at 1032.

Here, the Confidentiality Clause contained in the Confidentiality Agreement prohibits the unauthorized used, dissemination, and/or disclosure of Ever-Seal's Confidential Information (defined as information "not generally known in the industry in which [Ever-Seal] is engaged, about its business and which [Ever-Seal] desires to be kept confidential") and Confidential Materials (defined as the "physical embodiments of Confidential Information"). The specific Confidential Information and Materials at issue in this case include:

> Ever-Seal's unique processes and methods for permanently sealing wood and concrete; Ever-Seal's customer and prospective customer databases; information on Ever-Seal leads, inquiries, and prospective business opportunities and customer relationships; Ever-Seal's marketing strategies and plans; Ever-Seal's growth strategy and plans; Ever-Seal's methods for providing services efficiently and at an affordable price; Ever-Seal's approach to prospective customer relationships and selling permanent sealing services; Ever-Seal's confidential and proprietary sales presentation book; Ever-Seal's internal forms, documents, and processes for securing new business and ensuring customer satisfaction; and Ever-Seal's unique and proprietary truck design and functionality.

Ver. Compl. Ex. A ¶¶ 1-5. Such information and material is secret, business-related, and affords Ever-Seal a competitive advantage. Ver. Compl. ¶ 82. Therefore, the restrictions that prohibit Halferty's unauthorized use, disclosure, and dissemination of Confidential Information and Confidential Materials are enforceable.

In sum, Halferty knowingly and voluntarily entered into a written Confidentiality Agreement with Ever-Seal at the commencement of his working relationship with Ever-Seal, and the non-compete and confidentiality clauses contained therein are valid and enforceable. Ever-Seal can satisfy the first element of its breach of contract claim.

#### ii. Halferty breached the Confidentiality Agreement by working for DuraSeal.

As reflected in the Verified Complaint and attached Declaration of Tim Lucero, Ever-Seal terminated Halferty in November 2021, and Halferty has been working for DuraSeal since before his termination. Ver. Compl. ¶¶ 47-64; Ex. A, Lucero Decl., at ¶¶ 5-11. DuraSeal sells the same products and services as Ever-Seal in the same region. Ver. Compl. ¶¶ 50-52, 58-60; Ex. A, Lucero Decl., at ¶¶ 8-18. In fact, DuraSeal provides bids on the exact same projects as Ever-Seal. Ver. Compl. ¶¶ 58; Ex. A, Lucero Decl., at ¶¶ 8-11, 15-16. Halferty is further using Ever-Seal's Confidential Information and Materials to compete with Ever-Seal. Ver. Compl. ¶¶ 61; Ex. A, Lucero Decl., at ¶¶ 9-11, 14, 17-18. Accordingly, Halferty has breached and continues to breach the parties' Confidentiality Agreement by working for DuraSeal (whether in an employment, contractual, or advisory capacity).[16]

#### iii. Ever-Seal has been damaged by the breach.

Halferty's breach of the Confidentiality Agreement damaged and is damaging Ever-Seal in the form of lost business, customer relationships, and goodwill, as well as lost profits and administrative, marketing, recruiting, and training costs. Ver. Compl. ¶¶ 65-72, 87-88, 103-104; *see also* Ver. Compl. Ex. A ¶ 8.

---

[16] Halferty admitted under oath that DuraSeal is operating and actively soliciting business today, and that DuraSeal is in competition with Ever-Seal "if customers would call both companies" because "it's the same market" and "[b]oth companies are trying to sell their services and products for permanent sealing solutions[.]" Ex. B, Hrg. Tr. 35:19-36:3.

### 2. Intentional Interference with Business Relations[17]

Ever-Seal's claim for intentional interference with business relations requires that Ever-Seal show: (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and (5) damages resulting from the tortious interference. *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002). Ever-Seal can establish each of these elements such that Ever-Seal is likely to succeed on its intentional interference with business relations claim against Halferty.[18]

---

[17] Tennessee law governs Ever-Seal's intentional interference with business relations claim. North Carolina follows the choice-of-law rule *lex loci delicti* for tort claims, which provides that the law of the place of the injury controls and the place of the injury is "where the last act giving rise to the injury occurred." *Cardiorentis AG v. IQVIA Ltd.*, 373 N.C. 581, 321, 837 S.E.2d 873, 880 (2020). Here, the last act giving rise to the injury was Ever-Seal suffering damages, which occurred in Tennessee where Ever-Seal's business is based. *See id.* at 880-81 (noting last act is often suffering of damages and holding Swiss law governed because plaintiff suffered losses at corporate home in Switzerland); *McElmurry v. Alex Fergusson, Inc.*, No. 1:04CV389, 2006 WL 572330, at *10 (M.D.N.C. Mar. 8, 2006) (citing *ITCO Corp. v. Michelin Tire Corp*., 722 F.2d 42, 49 n. 11 (4th Cir. 1983)) (North Carolina law applied to tortious interference claim because "the last event necessary to render Defendant liable was Plaintiff's injury, which occurred in North Carolina where Plaintiff's business is based."); *Ferrante v. Westin St. John Hotel Co.*, No. 4:18-CV-108-D, 2020 WL 486198, at *6 (E.D.N.C. Jan. 29, 2020), *aff'd*, No. 20-1322, 2022 WL 396022 (4th Cir. Feb. 9, 2022) (North Carolina law applied to tortious interference claim because plaintiff felt economic loss of use of Bay Vista Interest at residence in North Carolina).

[18] Even if the Court were to apply North Carolina law to this claim, then the required elements are also satisfied. Under North Carolina law, a claim of tortious interference with a prospective economic advantage "arises when a party interferes with a business relationship by maliciously inducing a person not to enter into a contract with a third person, which he would have entered into but for the interference, ... if damage proximately ensues, when this interference is done not in the legitimate exercise of the interfering person's rights." *Schumacher Homes of N. Carolina, Inc. v. Buchanan*, No. 121CV00260MOCWCM, 2021 WL 5566771, at *3 (W.D.N.C. Nov. 29, 2021) (quoting *Beverage Sys. of the Carolinas, LLC v. Associated Beverage Repair, LLC*, 784 S.E.2d 457, 463 (N.C. 2016)). The elements for a claim of tortious interference with a prospective

i. **Ever-Seal has prospective business relationships with an identifiable class of third persons.**

Ever-Seal, which provides permanent wood and concrete sealing services, has prospective contractual relationships with individuals and businesses in need of permanent wood and concrete sealing services; stated differently, Ever-Seal has prospective business relationships with potential customers purchasing its sealing services. Ver. Compl. ¶ 91. *See Trau-Med*, 71 S.W.3d at 701 n.4 (relations protected by this action include "any prospective contractual relations, except those leading to contracts to marry, if the potential contract would be of pecuniary value to the plaintiff" including "the opportunity of selling or buying land or chattels or services, and any other relations leading to potentially profitable contracts."). *See, e.g., Yoe v. Crescent Sock Co*., No. 1:15-CV-3-SKL, 2015 WL 13847410, at *13 (E.D. Tenn. Dec. 11, 2015) (explaining plaintiff need only identify "a class of third persons" for prospective business relationships and finding allegations sufficient where plaintiff alleged defendant interfered with prospective classes of customers including outdoor retailers); *PPG Indus., Inc. v. Payne*, No. 3:10-CV-73, 2012 WL 1836314, at *4 (E.D. Tenn. May 21, 2012) (sufficient where counterclaim plaintiff identified prospective business relationship as potential paint-buying customers).[19]

---

economic advantage are: (1) a contract that would have been entered into but for the defendant's conduct; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to enter into the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff. *See Spirax Sarco, Inc. v. SSI Eng'g, Inc*., 122 F. Supp. 3d 408, 421 (E.D.N.C. 2015).

[19] To the extent the Court applies North Carolina law to this claim, then Ever-Seal has further identified at least 12 specific potential customers with which it had a prospective economic advantage and presented facts showing that Ever-Seal would have obtained contracts with these customers but for Halferty's interference. Ver. Compl. ¶¶ 69. Ever-Seal expects that it will be able to identify additional customers after the opportunity for discovery and analysis of DuraSeal's customer files and communications.

#### ii. Halferty had knowledge of those relationships.

Halferty, as a former estimator and sales manager on behalf of Ever-Seal, has been keenly aware of these prospective business relationships because, while at Ever-Seal, he was directly responsible for selling Ever-Seal's services to prospective customers and overseeing the sales team. Ver. Compl. ¶¶ 19-21, 25-28, 36, 89. *See, e.g., Interstate S. Packaging, LLC v. Korman*, No. 2:20-CV-207, 2021 WL 5161910, at *17 (E.D. Tenn. Sept. 5, 2021) (finding defendants had substantial knowledge regarding business relationships at issue based on their past work for plaintiff). He further had access to Ever-Seal's historical and future appointment information for the entire sales and operations teams and was apprised of Ever-Seal's sales numbers, marketing, and growth plans. Ver. Compl. ¶¶ 33, 44.[20]

#### iii. Halferty intended to cause the breach or termination of these relationships.

Halferty intended to cause a breach or termination of Ever-Seal's prospective business relationships by sabotaging sales on behalf of Ever-Seal, poaching and soliciting Ever-Seal's potential customers he learned of through his work for Ever-Seal and directing them to his separate competing company, using Ever-Seal's confidential and inside information to divert business to his separate competing company, and otherwise inducing potential customers to use DuraSeal's services rather than Ever-Seal's services. Ver. Compl. ¶¶ 47-64, 96, 100; Ex. A, Lucero Decl., at

[20] Even if the Court were to apply North Carolina law to this claim, the same evidence supports the conclusion that Halferty was aware of Ever-Seal's anticipated contracts with the identified potential customers for the same reasons. Even after his relationship with Ever-Seal terminated, Halferty was (and is) still aware of Ever-Seal's anticipated contracts with other potential customers based on knowledge of Ever-Seal's marketing and growth strategies and Halferty (either personally or by and through his DuraSeal representatives) discussing with prospective customers who else is submitting bids on the same projects.

¶¶ 2-19. Halferty clearly intended to recruit Ever-Seal's potential customers away from Ever-Seal and to DuraSeal. *See, e.g., Korman*, 2021 WL 5161910, at *17-18 (element satisfied where defendant intended to cause a breach of plaintiff's business relationships by soliciting plaintiff's customers whom defendants had come to know through work with plaintiff and directing them to defendant's competing business using insider information, derogatory remarks, and misrepresentations as to identity).[21]

**iv. Halferty used improper means to interfere with these relationships.**

Halferty has used improper means to interfere with Ever-Seal's prospective business relationships with customers by engaging in misrepresentations and deceit, misuse of inside or confidential information, unfair competition, and breach of his contractual duties to Ever-Seal (including his non-compete clause and confidentiality clause). Ver. Compl. ¶¶ 47-64, 94; Ex. A, Lucero Decl., at ¶¶ 2-19. *See generally Trau-Med*, 71 S.W.3d at 701 n. 5 (improper means are those that are illegal or independently tortious, such as fraud, misrepresentation or deceit, misuse of inside or confidential information, breach of a fiduciary relationship, and unethical conduct, such as sharp dealing, overreaching, or unfair competition). Halferty maliciously interfered not in the legitimate exercise of his own rights but, rather, with a design to injure Ever-Seal or gain some advantage at Ever-Seal's expense.[22]

---

[21] To the extent the Court applies North Carolina law to this claim, the same evidence supports the third element, i.e. that the defendant intentionally induced the third person not to enter into the contract.

[22] To the extent the Court applies North Carolina law to this claim, the same evidence supports the fourth element, i.e. that the defendant acted without justification.

### v. Ever-Seal has been damaged by Halferty's tortious interference.

Halferty's tortious interference has damaged and continues to damage Ever-Seal in the form of lost business, customer relationships, and goodwill, as well as lost profits and administrative, marketing, recruiting, and training costs. Ver. Compl. ¶¶ 65-72, 87-88, 103-104.

In light of all of the above, Ever-Seal has a strong likelihood of success on the merits of its claims. The first element for preliminary injunctive relief is satisfied.[23]

## B. Ever-Seal Will Suffer Irreparable Injury Absent Requested Injunctive Relief

Ever-Seal will suffer immediate and irreparable injury as a result of Halferty's ongoing competition. As the Sixth Circuit explained:

> The likely interference with customer relationships resulting from the breach of a non-compete agreement is the kind of injury for which monetary damages are difficult to calculate. The loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute. Similarly, the loss of fair competition that results from the breach of a non-competition covenant is likely to irreparably harm an employer.

*Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007) (internal citations and quotations omitted); *see also AmeriGas Propane, Inc. v. Crook*, 844 F. Supp. 379, 390 (M.D. Tenn. 1993) (finding irreparable harm from breach of non-compete because "competitive injuries and loss of customer goodwill suffered are difficult to quantify"; for example, the value of lost customer relationships, including lost repeat business from customer and lost referrals to other prospective customers, cannot be quantified). The Fourth Circuit has similarly recognized that the loss of customers and goodwill constitutes irreparable harm. *Update, Inc. v. Samilow*, 311 F. Supp. 3d 784, 796 (E.D. Va. 2018) ("Although it may be easy to calculate

[23] To the extent the Court applies North Carolina law to this claim, the same evidence supports the fifth element, i.e. that the interference resulted in actual damage to plaintiff.

the amount of harm caused with respect to a single transaction between defendant and a client, the Fourth Circuit has repeatedly recognized that '[t]he threat of a permanent loss of customers and the potential loss of goodwill also support a finding of irreparable harm.'").  Such injuries are precisely what Ever-Seal will suffer if Halferty is allowed to continue to breach the parties' Confidentiality Agreement and interfere with Ever-Seal's prospective business relations as reflected in the evidence presented here.

Halferty expressly acknowledged in the Confidentiality Agreement that "compliance with the terms of this Agreement is necessary to protect the business and good will of each party" and "breach of this Agreement will irreparably and continually damage the other and that an award of money damages will not be adequate to remedy such harm."  Ver. Compl. Ex. A ¶ 8.  He also expressly agreed that Ever-Seal "shall be entitled to both a preliminary and/or permanent injunction in order to prevent the continuation of such harm."  *Id.*

As these authorities demonstrate, Ever-Seal will likely suffer immediate and irreparable injury unless the Court issues a preliminary injunction to stop Halferty from committing further breaches and further intentional interference.  *See, e.g., Tenke Corp.*, 511 S.W.3d at 550 (reversing denial of preliminary injunction in breach of non-compete case); *Fruit of the Loom, Inc. v. Zumwalt*, No. 1:15CV-131-JHM, 2015 WL 7779524, *5 (W.D. Ky. Dec. 2, 2015) (granting preliminary injunction in breach of non-compete case); *I Love Juice Bar Franchising, LLC v. ILJB Charlotte Juice, LLC*, No. 3:19-cv-00981, 2019 WL 6050283, *12-13 (M.D. Tenn. Nov. 15, 2019) (granting temporary restraining in breach of non-compete case); *F.S. Sperry Co. v. Schopmann*,

304 F. Supp. 3d 694 (E.D. Tenn. 2018) (granting preliminary injunction in IIBR case); *Korman*, 2021 WL 5161910 (granting preliminary injunction in breach of non-compete and IIBR case).[24]

**C. Balance of Equities Tips in Favor of Ever-Seal**

Here, no harm to others will result from an injunction enforcing the terms of the parties' Confidentiality Agreement and prohibiting Halferty's intentional and tortious interference. The only third parties potentially affected by the injunction are prospective customers in need of permanent wood and concrete sealing services. Those prospective customers can still obtain permanent wood and concrete sealing services from Ever-Seal or other companies providing similar services. Accordingly, the requested relief will not harm any third parties.

Any harm Halferty might assert from the requested injunctive relief is not the kind of harm that weighs in his favor; such harm is not created by the injunction but rather harm that Halferty brought upon himself when he agreed not to operate a competing business. *See Leaf Funding, Inc. v. Butera*, No. 3:06-cv-00938, 2006 WL 2868976, at *4 (M.D. Tenn. Oct. 5, 2006) ("[The Court perceives no harm to the Defendants who are signatories to the Master Lease and Addendum because the temporary restraining order will merely prohibit them from violating the Master Lease[.]"); *Philips Electronics North America Corp.*, 631 F.Supp.2d at 712 ("an injunction would only require Hope to do that which he agreed to do in the Non–Competition Agreement and would prevent him from engaging in illegal and unethical conduct"). This self-inflicted harm is the result

[24] Fourth Circuit cases similarly support that preliminary injunctive relief is necessary to prevent the irreparable harm caused by breaches of non-compete agreements and tortious interference with a prospective economic advantage. *See, e.g.*, *NovaQuest Cap. Mgmt., L.L.C. v. Bullard*, 498 F. Supp. 3d 820 (E.D.N.C. 2020) (granting preliminary injunction in non-compete case); *Update, Inc. v. Samilow*, 311 F.Supp.3d 784 (E.D. Va. 2018) (same); *Philips Electronics North America Corp. v. Hope*, 631 F.Supp.2d 705 (M.D. N.C. 2009) (same); *Schumacher Homes of N. Carolina, Inc. v. Buchanan,* No. 121CV00260MOCWCM, 2021 WL 5566771 (W.D.N.C. Nov. 29, 2021) (granting TRO and preliminary injunction in tortious interference case).

of Halferty's willful actions and does not outweigh the harm to Ever-Seal. *See, e.g., Handel's Enterprises, Inc. v. Schulenburg*, 765 F. App'x 117, 122-23 (6th Cir. 2019) (affirming grant of preliminary injunction in breach of non-compete case). Moreover, as discussed above, the requested relief does not prohibit Halferty from continuing to be a salesperson for other products or services; it only prohibits Halferty from competing with the business of Ever-Seal, which he agreed to. Accordingly, the balance of equities tips in favor of Ever-Seal.[25]

### D. The Public Interest is Served By Granting Requested Injunctive Relief

No important public policies are implicated by the issuance of the requested injunctive relief in this case other than the general public interest in the enforcement of voluntarily assumed contract obligations. Issuing the requested injunctive relief will hold Halferty to the terms of the bargain that he and Ever-Seal entered into through the Confidentiality Agreement. Enforcement of these voluntarily assumed contract obligations is in the public interest and encourages fair competition. *See id.* ("public interest is always served in the enforcement of valid restrictive covenants contained in lawful contracts"); *I Love Juice Bar*, 2019 WL 6050283, *13-14 ("fair competition and enforcing contractual obligations are in the public interest"); *Philips Electronics North America Corp.*, 631 F.Supp.2d at 724 (public interest served by "ensuring that contracts are enforced" and preventing "unethical business behavior"). This factor weighs in favor of issuance of the requested injunctive relief.

---

[25] That DuraSeal is Halferty's sole source of income and that a restraint on that income would make it difficult for Halferty to successfully perform a Chapter 13 plan is no reason to deny the requested injunctive relief. *See generally In re Forehand,* No. 15-41980, 2016 WL 637955, at *10 (Bankr. S.D. Ga. Feb. 12, 2016), *citing In re Hohol*, 141 B.R. 293, 299 (M.D. Pa. 1992) (if the debtor is breaching his non-dischargeable obligation not to compete, the fact that enforcement of that obligation may deprive him of his only source of income "is of no moment" because "[t]he Bankruptcy Code was not intended to relieve [the debtor] of the consequences of an injudicious business deal").

## V. CONCLUSION

For the reasons discussed herein, Plaintiff respectfully requests entry of a preliminary injunction prohibiting Halferty from engaging in conduct that competes against Ever-Seal.

Respectfully submitted this the 17th day of March, 2022.

FOX ROTHSCHILD LLP

By: /s/ Brian R. Anderson
Brian R. Anderson
N.C. State Bar No. 37989
230 N. Elm St., Suite 1200
Greensboro, NC 27401
branderson@foxrothschild.com
(336) 378-5205

-and-

SPENCER FANE LLP

By: /s/ *Stephen J. Zralek*
Stephen J. Zralek
T.N. Bar No. 18971
511 Union Street, Suite 1000
Nashville, TN 37219
Tele: (615) 238-6305
Fax: (615) 687-2763
szralek@spencerfane.com
(Notice of Special Appearance forthcoming)

Breanna R. Spackler
M.O. Bar No. 67323
1000 Walnut, Suite 1400
Kansas City, MO 64106
Tele: (816) 292-8487
Fax: (816) 474-3216
bspackler@spencerfane.com
(Notice of Special Appearance forthcoming)

*Attorneys for Plaintiff*

# EXHIBIT A

## DECLARATION OF TIM LUCERO

I, Tim Lucero, hereby state under penalty of perjury that the following facts are true and correct to the best of my personal knowledge, information, and belief:

1.      I am over the age of 18 and have personal knowledge of the facts and circumstances described herein.

2.      I worked as an estimator for Plaintiff Ever-Seal, Inc. ("Ever-Seal") from approximately April 2021 to October 2021.

3.      I first met Defendant Stephen Brad Halferty ("Brad") during the interview process for Ever-Seal.

4.      Brad was my sales manager at Ever-Seal.  As sales manager, Brad attempted to create hostility between sales representatives and the operations staff.  He told the sales personnel to direct all communication to him as opposed to the Ever-Seal office or operations staff.  At the time, I trusted Brad and felt he was a good sales manager.

5.      Brad first approached me about working for DuraSeal, Brad's separate company that also provided permanent wood and concrete sealing services, in or around May 2021.

6. To my knowledge, all of the Ever-Seal sales people knew about DuraSeal except one.

7. To my knowledge, Brad recruited every sales person at Ever-Seal to work for DuraSeal except one, and he also recruited some Ever-Seal operations personnel to work for DuraSeal. He recruited these individuals while he was still working for Ever-Seal.

8. I know based on my personal observations and conversations with Brad that, while Brad was the sales manager for Ever-Seal, he was bidding DuraSeal on the same projects as Ever-Seal.

9. I know based on my personal observations and conversations with Brad that, while Brad was the sales manager for Ever-Seal, he poached leads for DuraSeal directly from Ever-Seal. He later began receiving leads directly as DuraSeal. Regardless, anything that came in for both, Brad would make sure that DuraSeal got the job rather than Ever-Seal, whether by altering prices, sabotaging the sale for Ever-Seal, persuading the customer that DuraSeal could do the job quicker, etc.

10. I know based on personal observations and conversations with Brad that DuraSeal was awarded a $75,000 job in approximately June/July 2021 that Brad originally learned about through Ever-Seal and that was originally bid on by Ever-Seal. I understand that Brad was able to build his first production trailer for DuraSeal based on the funds he received from this job.

11. While Brad was still the sales manager for Ever-Seal, he would:

a. Ask others to run his Ever-Seal sales appointments for him because he had already been out to sell the same project on behalf of DuraSeal;

b. Ask others to run his Ever-Seal sales appointments for him under his name so that he could do other work for DuraSeal and Ever-Seal operations staff would not know that he was missing appointments;

c. Attend his scheduled sales appointments on behalf of Ever-Seal and purposely not make the sale, whether by refusing to do the sales process the correct way, being unfriendly, not showing the value of the product, etc.; instead, he would simply measure and give a high price on behalf of Ever-Seal and then send a DuraSeal representative out to secure the sale by doing the sale the correct way and for a lower price;

d. Ask others to purposely run jobs high for Ever-Seal so that he could get the job for DuraSeal;

e. Commit Ever-Seal to jobs that were beyond what Ever-Seal could perform or was supposed to do.

12. Based in large part of Brad's persuasion, I left Ever-Seal in October 2021 to go work for DuraSeal. I worked for DuraSeal from October 2021 to January 2022.

13. During the time I worked for DuraSeal, DuraSeal operated mainly in North Carolina and South Carolina, and it also began marketing in Florida, Georgia, and up the gulf coast.

14. During the time I worked for DuraSeal, DuraSeal utilized the same Seal-It product that Ever-Seal uses, it employed the same or substantially the same sales process and presentation materials as Ever-Seal, and it performed the exact same operations and processes as Ever-Seal to seal wood and concrete (and if not, it tried to replicate them as closely as possible).

15. During the time I worked for DuraSeal, DuraSeal competed directly against Ever-Seal on many projects. I would estimate that approximately 60 to 70 percent of the projects I bid on for DuraSeal were also bid on by Ever-Seal.

16. As a sales representative for DuraSeal, I learned that Brad would try to sell customers on DuraSeal rather than Ever-Seal by make representations like: (1) DuraSeal, unlike Ever-Seal, is a local company; (2) production for Ever-Seal is back-logged (raising concerns about timeliness of completion); and (3) Ever-Seal is less committed (raising concerns about quality of services).

17. I am aware based on my time working with Brad that he knows where Ever-Seal advertises and he is advertising for DuraSeal in the same sources.

18. I believe Brad used Ever-Seal's inside information about bids and customer interest to get business for DuraSeal and that Brad used and is using Ever-Seal's system and marketing efforts to get business for DuraSeal.

19. To my knowledge, Brad operates his competing company under the name DuraSeal but his company is not registered anywhere. The website that Brad uses for DuraSeal is durasealit.com.

20. I left DuraSeal in January 2022 because I lost trust in Brad and felt DuraSeal was not an honest company.

21. I returned to Ever-Seal in January 2022 and, at that time, informed Ever-Seal's CEO Steve Nelson about Brad's conduct.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 02/07/2022 Timothy J. Lucero

Tim Lucero

citrix | RightSignature

**REFERENCE NUMBER**
072F64C1-FE38-4685-A2A3-3962E220D60A

# SIGNATURE CERTIFICATE

| TRANSACTION DETAILS | DOCUMENT DETAILS |
| --- | --- |
| **Reference Number**<br>072F64C1-FE38-4685-A2A3-3962E220D60A | **Document Name**<br>Declaration Of Tim Lucero |
| **Transaction Type**<br>Signature Request | **Filename**<br>declaration_of_tim_lucero.pdf |
| **Sent At**<br>02/07/2022 15:11 EST | **Pages**<br>5 pages |
| **Executed At**<br>02/07/2022 15:27 EST | **Content Type**<br>application/pdf |
| **Identity Method**<br>email | **File Size**<br>129 KB |
| **Distribution Method**<br>email | **Original Checksum**<br>365b5c1fb22a0b9a65b7789efc7c032b02e843db7785d213daadbc321d5e268c |
| **Signed Checksum**<br>2d1a36a9aaf18f2590d1650919d8058858538bf2500501d2e9ecd909ccdfc7cb | |
| **Signer Sequencing**<br>Disabled | |
| **Document Passcode**<br>Enabled | |

# SIGNERS

| SIGNER | E-SIGNATURE | EVENTS |
| --- | --- | --- |
| **Name**<br>Tim Lucero<br>**Email**<br>tim.lucero@ever-seal.com<br>**Components**<br>2 | **Status**<br>signed<br>**Multi-factor Digital Fingerprint Checksum**<br>9929a271e15cebd001cc3751163ad2cce320d38962578f84789697ed558444c3<br>**IP Address**<br>172.58.192.87<br>**Device**<br>Safari via Mac | **Viewed At**<br>02/07/2022 15:24 EST<br>**Identity Authenticated At**<br>02/07/2022 15:27 EST<br>**Signed At**<br>02/07/2022 15:27 EST |

# AUDITS

| TIMESTAMP | AUDIT |
| --- | --- |
| 02/07/2022 15:11 EST | Melissa Tomasewski (mtomasewski@spencerfane.com) created document 'declaration_of_tim_lucero.pdf' on Chrome via Windows from 68.184.170.64. |
| 02/07/2022 15:11 EST | Tim Lucero (tim.lucero@ever-seal.com) was emailed a link to sign. |
| 02/07/2022 15:13 EST | Tim Lucero (tim.lucero@ever-seal.com) viewed the document on Mobile Safari via iOS from 172.58.193.105. |
| 02/07/2022 15:24 EST | Tim Lucero (tim.lucero@ever-seal.com) viewed the document on Safari via Mac from 172.58.193.157. |
| 02/07/2022 15:27 EST | Tim Lucero (tim.lucero@ever-seal.com) authenticated via email on Safari via Mac from 172.58.192.87. |
| 02/07/2022 15:27 EST | Tim Lucero (tim.lucero@ever-seal.com) signed the document on Safari via Mac from 172.58.192.87. |

# EXHIBIT B

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| IN RE: | . | Case No. 22-00101-5-DMW |
| | . | |
| | . | |
| STEPHEN BRADLEY HALFERTY, | . | 300 Fayetteville Street |
| | . | Room 208 |
| | . | Raleigh, NC 27601 |
| Debtor. | . | |
| | . | February 23, 2022 |
| . . . . . . . . . . . . . . | . | 9:31 a.m. |

TRANSCRIPT OF EMERGENCY MOTION FOR RELIEF FROM STAY
BEFORE HONORABLE DAVID M. WARREN
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor: Sasser Law Firm
By: TRAVIS SASSER, ESQ.
2000 Regency Parkway, Suite 230
Cary, NC 27518

For Ever-Seal: Fox Rothschild, LLP
By: BRIAN R. ANDERSON, ESQ.
230 N. Elm Street, Suite 1200
Greensboro, NC 27401

Audio Operator: Ahronda Crossman

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail: jjcourt@jjcourt.com**

**(609) 586-2311 Fax No. (609) 587-3599**

## I N D E X

| | PAGE |
|---|---|
| **WITNESS** | |
| STEPHEN BRADLEY HALFERTY | |
| Direct Examination by Mr. Sasser | 16 |
| Cross Examination by Mr. Anderson | 24 |
| Redirect Examination by Mr. Sasser | 38 |

| EXHIBIT | | ID. | EVD. |
|---|---|---|---|
| A | Confidentiality Agreement | 36 | 39 |

COURTROOM DEPUTY: All rise. United States Bankruptcy Court for the Eastern District of North Carolina is now in session. Honorable David M. Warren, Judge, presiding. God save these United States and this Honorable Court.

Please be seated.

THE COURT: Thank you.

COURTROOM DEPUTY: Emergency motion for relief from stay in the matter of Stephen Halferty, 22-00101, Brian Anderson, attorney for Ever-Seal, Travis Sasser, attorney for Stephen Halferty.

THE COURT: Good morning. Mr. Anderson?

MR. ANDERSON: Good morning, Your Honor, Brian Anderson on behalf of Ever-Seal, Inc.

THE COURT: You may proceed.

MR. ANDERSON: Thank you, Your Honor. Appreciate the Court's indulgence on --

THE COURT: Sure.

MR. ANDERSON: -- hearing this --

THE COURT: Glad to.

MR. ANDERSON: -- on short term basis. As was announced, this is an emergency motion for relief from stay. Just to give Your Honor a little background, Ever-Seal is a Tennessee corporation. They provide wood and concrete sealing, permanent sealing services throughout the southeast.

THE COURT: Do they make their own product or just

supply it?

MR. ANDERSON: It's the product they use, they're one of the few authorized installers of a product called Seal It which I think requires some technical expertise in how it's applied and the processes used.

THE COURT: Is it exclusive license generated by the manufacturer?

MR. ANDERSON: Your Honor, I'm not 100 percent sure, but I believe so. I don't think this is a product you can pick up at Home Depot --

THE COURT: Lowe's.

MR. ANDERSON: -- or Lowe's an apply it --

THE COURT: Okay.

MR. ANDERSON: -- yourself.

THE COURT: All right.

MR. ANDERSON: The debtor worked for the company from May 2020 to November of 2021.

THE COURT: So, for a year?

MR. ANDERSON: It's about 18 months.

THE COURT: And your non-compete's on the two-year?

MR. ANDERSON: Non-compete is during the term of the agreement and two years beyond.

THE COURT: Okay.

MR. ANDERSON: So, it's a two-year period beyond --

THE COURT: Okay.

MR. ANDERSON: -- whenever the termination of the employment begins.

THE COURT: When did he sign that agreement?

MR. ANDERSON: The agreement was signed May 26, 2020 at the --

THE COURT: So, the day, essentially, when he was employed?

MR. ANDERSON: Yes, Your Honor.

THE COURT: Okay.

MR. ANDERSON: And the confidentiality agreement which a copy was attached to our motion, it was also attached to the Tennessee action in this case.

THE COURT: I looked for it. I didn't see it, though. You sure it's in there? Maybe I missed it.

MR. ANDERSON: It is, Your Honor, and I have a copy I can hand up.

THE COURT: Hand that up to me.

MR. ANDERSON: Yeah, let me do that.

THE COURT: I'm kind of curious to see what that looks like.

MR. ANDERSON: There were several exhibits in the motion to lift stay. Exhibit A was a copy of the action that was filed in Tennessee and the confidentiality agreement is an exhibit to that complaint.

THE COURT: Okay.

MR. ANDERSON: So, that's where it's --

THE COURT: I must have just missed it then.

MR. ANDERSON: Yeah, I apologize for not --

THE COURT: That's okay.

MR. ANDERSON: -- having it more front and center there and it's -- the confidentiality agreement, it goes through what confidential information is defined as. Paragraph 3 has the various restrictions on the use of that information outside of the business.

THE COURT: Does everybody sign one of these who works for your client?

MR. ANDERSON: I can't answer that question, Your Honor.

THE COURT: Is everyone for two years?

MR. ANDERSON: I can't answer that, Your Honor.

THE COURT: Okay.

MR. ANDERSON: But relevant to this case, the debtor did sign one at the beginning of his employment. What Ever-Seal had learned recently was that sometime around June of 2021 the debtor began a business called DuraSeal. It's we were unable to determine whether that was a separate corporate entity or just a sole proprietorship under that name and began competing against Ever-Seal in various markets. That was admitted in their response to the motion to lift stay.

This case was filed on January 14th, 2022. Ever-Seal

wasn't listed as a creditor, wasn't provided notice in the case, had done a due diligence background check for bankruptcy on January 13th, so the day before it was actually filed and then filed a verified complaint under the penalty of perjury by Ever-Seal's CEO on February 8th of this year alleging breach of contract, breach of fiduciary duty, intentional interference with business relations and seeking injunctive relief and damages and also filed a motion for a temporary restraining order and preliminary injunction in that case.

The Tennessee Court on February 10th issued a 19-page opinion finding that there was a likelihood of success on the merits on all the claims.

THE COURT: It was unopposed, wasn't it?

MR. ANDERSON: It was. The Court, in fact, it looks like took an unusual step of saying this harm appears to be so grave and immediate that notice is not even required of the debtor, although Ever-Seal did take some steps to try to notify the debtor of the case. And that opinion was just issued. It was issued two days after the complaint was filed and it noted that there would be immediate and irreparable injury of loss if the debtor was allowed to continue to compete against Ever-Seal.

You know, again, I understand it was all done post-petition, but I think, you know, we'd be remiss to ignore some of the findings of another Federal Court that found the

agreement to be reasonable in duration and scope, found that the confidential information was likely trade secret material and that Ever-Seal could demonstrate irreparable injury if he's not enjoined from continuing to breach the non-competition clause in the form of lost business.

So, the Court then issued temporary restraining order. They had originally scheduled a preliminary injunction hearing for today. It was then it was continued to tomorrow, obviously not anymore. We found out about this case. So once -- as soon as my client found out about it, filed a notice of bankruptcy in the Tennessee action and now that action is stayed.

So, what we are seeking here today is to lift the stay just to allow the District Court action to proceed just so that my client can obtain injunctive relief. We're not seeking to prevent the debtor from being able to appear or contest the motion for preliminary injunction. The debtor is going to be free to make whatever arguments it wants to make on whether that agreement is valid or whether there is harm or lack thereof to my client. But we think that all the Robbins factors are met and that it's the most efficient place for this to be heard would be in the Tennessee Court because it's purely a matter of Tennessee contractual law.

The Tennessee federal judge, who's very familiar with that law, has already looked at this, reviewed it, analyzed it,

and found that there is a likelihood of success on the merits for my client. Admittedly, the case hasn't been pending very long, but I think the efforts that have been taken would have to be duplicated here. Again, if the stay is not lifted, I think at least the factors, judicial economy is in support of lifting the stay --

THE COURT: So, judicial economy is having this bankruptcy case in the Eastern District of North Carolina and the District Court case in the Middle District of Tennessee, two separate courts?

MR. ANDERSON: You're right, Your Honor. But I think they can proceed --

THE COURT: How does that make sense?

MR. ANDERSON: Well, because what we're seeking is just to obtain the injunctive relief. We're not seeking to execute on a judgment. We're not seeking to take any action over property of the estate.

THE COURT: I'm still looking at judicial economy.

MR. ANDERSON: So --

THE COURT: This case isn't going anywhere. This case is going stay here in the Eastern District of North Carolina.

MR. ANDERSON: Correct.

THE COURT: Right.

MR. ANDERSON: Correct. I mean, I think the impact

on this case would be if the debtor is required to fulfill his contractual obligations. The impact is on his -- he’s going to have to find other work. But to have -- if this case is, we have to re-file the complaint here, re-file a motion for preliminary injunction, have it heard --

THE COURT: You would simply remove it, that’s not a big deal.

MR. ANDERSON: Another hearing if, you know, this -- one federal judge has already looked at this, already reviewed it.

THE COURT: No, no, but he’s not that deep into it. I mean, again, it’s not that complicated. Go ahead.

MR. ANDERSON: Yeah. I mean, so, I mean, I think, you know, again, you know, there are some efficiency concerns though. It’s, you know, we’re --

THE COURT: You know, we do this all the time. So go ahead, go ahead.

MR. ANDERSON: You know, I would say, I mean, at least, you know, the other factors involved are whether the estate can be protected. You know, we’re not, again, not seeking to execute on a new property here. It’s just to seek injunctive relief under the contract itself.

THE COURT: Okay. Great. Thank you.

MR. ANDERSON: Thank you, Your Honor.

THE COURT: Mr. Sasser?

MR. SASSER: Yes, Your Honor. Just as it relates to the judicial economy, so there's a monetary claim that, you know, that would have to be liquidated. Clearly, if you read the Middle District of Tennessee pleadings, they're talking about items that are dischargeability issues like breach of fiduciary duty, tortious interference and you might say, well, that doesn't work in Chapter 13, but that is possible.

And then you've got the injunctive side of it. It's all really one fact pattern. Two of those, the issue of the amount of the claim and how much should get paid on the claim and dischargeability are very much going to be in this court. So it is very inefficient to have part of it heard in Tennessee and then these other issues that are here in North Carolina. So I think the judicial economy would say it should be here.

The best reason that the Tennessee Court had I think related to why the preliminary injunction should be issued had to do with the idea that my client was essentially stealing leads or sabotaging leads and then stealing them and converting them. And my client is here --

THE COURT: Well, if he's in bankruptcy, it didn't work very well.

MR. SASSER: This is, well, there's -- yes, that's possibly true, but we can, I mean, we can put on, it won't take very long. I can have my client on the stand. He can go through explain he is not doing that, he hasn't been in the

company for 90 days, he never did take any of the leads and that essentially the harm to the estate is that a lot of money has been spent to generate the leads that they're working now. They have a lot of activity in this business and so and it's nothing to do with Mr. Anderson's client. It's just stuff that they've generated.

So, the idea that, you know, Ever-Seal, Mr. Anderson's clients, they want to put my client out of business and he can't work, so that absolutely affects his reorganization and things of that nature. Your Honor said -- took the words out of my mouth. The solution is to remove the Middle District of Tennessee action to not have to duplicate the pleadings and effort, remove it over here.

This is where Mr. -- my client was recruited, he lives here, he was recruited here, his sales territory is here in North Carolina. The customers that he, you know, that are claiming to be poached are all in North Carolina. So this idea that somehow Tennessee is a more efficient place for this litigation to proceed just simply factually it's just not correct.

We think that the estate, including my client operates a sole proprietorship, he does business as DuraSeal and that is -- it's valuable both because he's got ongoing activity. I mean, you might say, well, it's a contracting business, right, how much value does it really have. Well,

they generated leads, they have phone numbers, they're working

jobs, and so there is value there and I think that the Middle

District of Tennessee Court wasn't, you know, that is not a

primary focus of the Tennessee Court and I think that there are

some real due process problems when we're talking about a

pleading filed on February 8th and we have a 20-page opinion

coming out on February the 10th.

My client deserves a chance to be heard before his

business is shut down, although I do agree with the Middle

District of Tennessee Court if it was true that my client was

actively stealing clients or leads, that would be a very

serious matter.  There is no evidence of that and we can refute

whatever attempted, you know, Mr. Anderson has the burden of

proof, okay.

We're here on like a five-day old pleading over a

three-day weekend, and I'm here to say they've got no evidence

that my client is stealing the leads actively.  And, in fact,

our evidence will be he didn't do that and all the leads that

he has now are purely generated through his own, their own

expenses and their own money and there's no desire to steal the

leads and there's no -- and so it gets to be a due process

issue where everything -- and my client deserves a chance to be

heard.

I think he can be heard in Tennessee, but I think

it's more efficient for him to be heard here and I think that

when you talk about the complaint that was filed, it's very kind of, you know, they talk about in their motion there's 12 jobs that were stolen. We need to know, give me names and, you know, names and dates here because this is a very serious allegation and we deserve to be able to put on evidence to refute and not just take their word for it. I mean, this is the difference between, this is what we're asking for. We're asking for the chance to just simply be heard and not be just sort of railroaded really quickly.

So, you know, if Your Honor would like to put, you know, like to put my client on the stand and go through some of these issues, but we feel strongly that at least for now keeping in mind that even a motion for relief normally gets heard around 30 days. We're here five days later which is fine. But they don't have any evidence and we say we can put on evidence and refute what they say. So we would ask that the motion be denied.

THE COURT: Okay. Mr. Anderson, do you have any witnesses?

MR. ANDERSON: No witnesses, Your Honor. We would cross the debtor if he wants to take the stand, but I think the Court can take, you know, can take judicial notice of the pleadings that were filed in the other court. You know, we'll note that what Mr. Sasser is arguing is the harm for this case going forward at all, not the harm to his client for having a

hearing, a preliminary injunction hearing where he would be
able to make all of these arguments, put on whatever evidence
he feels necessary.

THE COURT: Well, I'm looking for cause under 362. I
mean, you got to give me something if you want your relief. So
just the pleadings you have with a two-year restriction which
is longer than the time the debtor worked for it according to
your proffer, so I'm going to let the debtor testify and let's
see what we got.

MR. ANDERSON: All right. That's fine, Your Honor.
What I would suggest that if, you know, one option would be
would be to treat this motion as a preliminary motion subject
to a final hearing where if the Court wants witnesses on this,
then we --

THE COURT: I mean, we set it at your request. I'm
ready to roll. We're here. We're here at 9:30. We're ready
to go.

MR. ANDERSON: All right. Understood.

THE COURT: Okay. Call your witness, Mr. Sasser.

MR. SASSER: Call Stephen Halferty to the stand.

THE COURT: Come right up and be sworn, sir.

COURTROOM DEPUTY: Place your left hand on the Bible
and raise your right.

STEPHEN BRADLEY HALFERTY, DEBTOR, SWORN

COURTROOM DEPUTY: Take the stand in that black chair

right there.

DIRECT EXAMINATION

BY MR. SASSER:

Q Please state your name.

A Stephen Bradley Halferty.

Q And you're the Chapter 13 debtor in this case?

A Correct.

Q Where do you live?

A 1132 Shadow Lake Drive, Raleigh, North Carolina.

Q And how long have you lived there?

A Just over five years.

Q Okay. Mr. Halferty, you previously, well, sorry, can you explain how it is that you came to be in a business relationship with Ever-Seal?

A Yes. Began I guess the interview process probably in April of 2020, was hired approximately May of 2020 and then began actually a two-day training process in June of 2020.

Q What had you done before you started to be in business with Ever-Seal?

A I've been in home improvement, basically residential home improvement on the sales side for approximately 30 years. Started out with College Pro Painters back in college, so the I guess graduated '93, so probably 1990 started with painting and then went to graduate school and moved to Raleigh in 1996 and started a painting company and got into flooring after that.

Q What was your sales territory for Ever-Seal?

A It started out for the State of North Carolina. So I was occasionally going to Charlotte. Never went into South Carolina. And then approximately end of March 2021, a new rep was hired to take over the Charlotte market who I trained and then my territory was cut to Raleigh.

Q Did you ever have Tennessee as part of your sales territory?

A No.

Q How long were you trained by Ever-Seal?

A It was designed as a five-day training process in which I would be riding along with the owner, Steve Nelson. The training consisted of observing him selling, you know, Ever-Seal to customers, so actually running appointments and observing the whole sales process. As it turns out, the training was truncated because I had been doing this all my life, so training consisted of two days, approximately 10 appointments of me observing Steve. By the third day, I was doing the presentations, the sales presentations, and writing up the contracts. And by the middle of the fourth day, you know, he went back to Tennessee.

Q Were you working as a 1099 independent contractor or a W-2 employee?

A Correct, just a 1099 non-employee contractor.

Q Did you have any kind of base compensation?

A No, strictly commission.

Q Okay, strictly commission. And what is the product or what is the service that Ever-Seal does?

A Permanent wood and concrete sealing, so pressure washing and applying the sealant.

Q Okay. And where does it get its product from?

A There's a company Seal It out of Saskatoon, Saskatchewan that provides the product.

Q And how long has that company been in operation and distributing this product?

A Right. So, my understanding is the product itself has been around for 55 years. To my understanding, Seal It has been a supplier of that product in excess of 25 years.

Q Is it -- do they only distribute their product to certain people or to certain companies?

A No, there's no authorization required to purchase the product. In fact, you could call up and order five gallons and seal your own deck. They provide instructions, you know, installation instructions with the order so there's not technical, you know, expertise required. There's no, you know, territories or distributorships that need to be purchased in order to buy the product.

Q So, you currently purchase this product using under the DuraSeal name?

A That's correct.

Q Was there any qualification process before you could order the product?
A Not at all.
Q Mr. Halferty, I'd like draw your attention to this document here. Can you identify that document?
A Yeah, those are the wood seal instructions provided by the manufacturer with the purchase.
Q So, they actually will send this document to you when you purchase the five-gallon?
A That's correct, yup. It's in like a packing envelope, you know, with the 55-gallon drums.
Q Okay. And this explains all the manufacturer's recommendations about how to apply it?
A Correct.
Q Okay. Did Ever-Seal do something different than what the manufacturer suggested be done relative to this?
A Not to my knowledge. I was never trained on any of the operation side, so any of the installations that Ever-Seal did, I never rode on a truck or learned how to install the project as part of any Ever-Seal training.
Q Because you were solely on the estimating and sales side?
A Just sales, correct.
Q Okay. When did the company that you own and operate, DuraSeal, when did that open?
A June, approximately June of 2021 we started the website

was live and began investigating marketing opportunities.

Q And you're still operating DuraSeal now?

A That's correct.

Q Okay. Is DuraSeal taking any of Ever-Seal's leads at this time?

A No, I have not had access to any Ever-Seal software, database, client list for over 90 days now.

Q Since the business DuraSeal started, how much has DuraSeal spent on marketing to generate its own customer leads?

A I believe that number is approaching $180,000 now.

Q How does it market?

A Primarily print and then, you know, this time of year we've started doing some of the home and garden shows, spring and garden shows.

Q Okay. Can you identify this document I've put on the screen?

A Yes. This is an accounting report of the marketing spend through whatever the date of the document is to show that, you know, we've invested heavily to generate our own leads.

Q Okay. And if I can draw your attention to this. What -- can you identify this document?

A Yes. So, this is a call log printout. We have unique call tracking numbers for each of our print ads, so there's a different local phone number so we can track the number of calls that are coming in. This is a call log from one of those

lead sources just showing the volume of calls. So from June and through maybe December or wherever that, you know, printout was, there are 319 calls from that source alone.

Q Okay. And this goes on and on and, obviously, lots of calls, right? I mean, this is -- that’s what that reflects?

A Correct.

Q And this is Marketing Source 1. Draw your attention to this document. Can you identify that document?

A Yup, so that’s just a similar call printout sheet from a different print marketing source with 210 calls.

Q And can you identify that document?

A Yup, it’s our third marketing source call log, 150 calls.

Q Did you ever poach or take any of Ever-Seal’s leads and covert them to your own benefit?

A No. In fact, the time in question from June of 2021 through November of 2021, which is the overlapping time of when the kind of DuraSeal was in its infancy and I was still a sales rep, not employee, for Ever-Seal, I ran approximately 400 leads for Ever-Seal, sold about $460,000 worth of business while only running 12 appointments on behalf of DuraSeal for about $14,000 in sales.

So, during that time, during that five-month period, I was still the top producer at Ever-Seal, top closing rate, top revenue per lead which are all, you know, sales efficiency metrics. So, there is -- it would be impossible to be shifting

leads over to DuraSeal while still outperforming everybody.

Q Can you identify that document?

A This is a sales report that I did for October of 2021 showing all of the sales reps for Ever-Seal.

Q You had in year number one at 113, is that right?

A Correct.

Q Can I get you to identify that document?

A Yup. This is a metric that I have used in past businesses, not one that Ever-Seal was familiar with, but it's essentially, you know, revenue per lead is the primary sales efficiency metric for home improvement contractors. So, it accommodates average job size and closing rate altogether. So, this is, you know, if the marketing cost is $150 a lead, then we know that every assigned lead per rep is going to generate approximately this amount of revenue. And the goal is you want to feed your top reps so you get the best return on your marketing spend.

Q And can I get you to identify that document?

A This is the closing rate which is the ratio of, you know, sales to leads run for the month of October which is my last full month with Ever-Seal.

Q And can I get you to identify that document?

A Yup. This is the same metric for all times. So, for all reps that worked at Ever-Seal during my time at Ever-Seal, including so the top four people were people that I had

trained, as well, to sell.

Q So, during the time you're saying that before you formally parted ways in your independent contractor role with Ever-Seal, you're saying that DuraSeal sold about $13,000 worth of work?

A That's what I personally sold, yes.

Q Okay. Was there other DuraSeal reps that were --

A I had a rep based in Charlotte that was selling, as well.

Q And just so I'm clear, I believe you said this, but the process is you powerwash the surface, of course, this is on the installation side. On the estimating side, I believe you say that you, you know, you went out and you quoted the jobs. On the installation side, you follow the manufacturer's instructions, you pressure wash, which is on the instructions, and then you apply the sealant, that's --

A Correct.

Q Okay. How long does it take to train somebody to install or to apply this product professionally?

A I mean, I'm sure there are nuances that would come out with, you know, different types of jobs, but in general, you know, if someone has any type of pressure washing experience, I mean, they're, you know, ready to go after a day of observing, you know, how to, you know, kind of how heavily to apply the sealant because if you know how to pressure wash, I mean, that's 80 percent of it.

Q And if, in fact, you're ordered to cease operations, what

is the harm that would result, or would there be harm and, if so what would that harm be?

A Yeah. I mean, basically, I would, you know, not have an income. I've invested heavily in marketing which continues to make the phone ring. I mean, it would be catastrophic.

Q How many jobs do you have in process right now?

A As far as on the calendar yet to be produced?

Q Sure.

A Probably about 20 to 25 just off the top of my head.

MR. SASSER: Pass the witness.

THE COURT: Mr. Anderson.

MR. ANDERSON: Thank you, Your Honor.

CROSS EXAMINATION

BY MR. ANDERSON:

Q Good morning, Mr. Halferty.

A Good morning.

Q So you worked for EverSeal from May, 2020 to around November, 2021, is that right?

A Yeah. I didn't start training until June. So I was hired and then there was a period before I actually started training.

Q And EverSeal uses a product called Sealant, is that right?

A Correct.

Q Is that the same product that DuraSeal uses?

A Correct.

Q And prior to your work with EverSeal had you worked in the

wooden concrete sealing industry before?

A Well, sealing is kind of a broad term in the industry. So I've been in the coatings industry for about 30 years. So a lot of people are familiar with Thompson's WaterSeal which is a form of sealant, but different than the sealant provided by Seal It, Incorporated out of Canada. So, I had not worked with that product prior to EverSeal, but I have used all different types of sealants and coatings for 30 years prior to that.

Q And you testified that you received some training when you began at EverSeal, is that right? And you said that was two days of training?

A Correct.

Q And when you were working with EverSeal were you given access to just how EverSeal does business to their processes for generating sales leads?

A No. I was not involved in the marketing side at all.

Q How about EverSeal's customer and perspective customer database, did you have access to that information?

A They provided that in approximately January of 2021.

Q Did you have access to leads generated by EverSeal?

A In the form of they would, you know, their administrative team would schedule appointments so I had a Google calendar that would tell me, you know, the date and time that I was, you know, supposed to meet with customers.

Q And did you become a sales -- you started as an estimator,

is that right?

A Mm-mm.

Q And then did you become a sales manager or --

A Correct. Yeah. I never had a business card to that title, but I did train new reps that came on board in March of 2021.

Q How many reps did you have underneath of you?

A I believe five -- well, four plus myself total reps. But four underneath me.

Q Okay. And during your -- with your business relationship with EverSeal did you have access to EverSeal's marketing strategies?

A No.

Q Did you ever have access to any gross strategies or plans?

A He may have shared future markets that he would launch, but those would be in the context of conversations when business started to get slow me requesting, you know, what is going on with marketing, so I could understand why a top producer is not receiving, you know, a full plate of leads.

Q Did you have access to their pricing information?

A Yes. That was also provided to each customer during the estimate.

Q How about sales presentation materials?

A I was trained with the EverSeal presentation materials. Immediately upon completion of my training I developed my own

sales presentation which I also shared with the future reps that I trained, you know, brought copies of that. But I've only used my own sales presentation.

Q That was something that you generated while you were working with EverSeal.

A While I was a non-employee contractor. Yes.

Q And you were terminated November, 2021?

A I still haven't even received notification I was terminated.

Q Why did your business relationship end in November of 2021?

A They claimed that I did not show up for assigned appointments. This was the Friday before Thanksgiving. I was asked at the beginning of Thanksgiving by Alyssa O'Gorman of EverSeal what time I needed off for Thanksgiving. I requested the Friday before Thanksgiving to the Friday after Thanksgiving. She said that should not be a problem. I didn't hear anything else. I assumed the time was blocked off and I was out of town and they had scheduled estimates.

Q And did EverSeal request in writing that you return all confidential materials back to EverSeal?

A Alyssa texted me approximately the -- well, I'll say the last week of December. I was out of town at the time. I expressed my willingness to return them. She said a rep would be in town the week of January 3rd, and I never heard back from

EverSeal regarding that matter.

Q So, it’s your testimony today that you were not requested in writing on or around November 25th, 2021 --

A That is correct.

Q Okay. Is DuraSeal -- do you operate as a sole proprietor?

A It is -- I believe it’s an escort. I’d have to find the filing.

Q Okay. So, if you went on to the Duraseal (indiscernible) State website like, does DuraSeal have its own corporate registration?

A I believe so.

Q Okay. Who would have prepared those documents?

A I would have. And I think it’s Delaware. I don’t think it’s North Carolina.

Q But you’re not sure about that?

A I’m not off the top of my head, no. Because this was back in June of last year.

Q If you had prepared separate corporate existence with this company would you have been -- would you be the hundred percent owner of that company?

A Yes.

Q And what is your geographic this breach as far as where you sell the products?

A So, we’ve been marketing in Wilmington, Raleigh -- what’s called the metro areas, Wilmington, Raleigh, Charlotte and

Greenville. And then in Tampa, Florida.

Q Are you -- do you market your product in South Carolina?

A Greenville, South Carolina.

Q Florida?

A Yes. Tampa.

Q Georgia?

A No.

Q Any other states outside of North Carolina we haven't talked about?

A No.

Q And you testified that you started DuraSeal approximately June, 2021.

A Yes.

Q And what date was your first sales appointment you made under the name DuraSeal?

A I would have to look that up, but I would say late July or early August of 2021.

Q And how about the date of your first sale under DuraSeal?

A What did you just ask?

Q I asked when your first sales appointment was.

A Oh, first sales appointment versus first sale? Probably the same week.

Q So, prior to November, 2021 in the summer 2021 time frame.

A Mm-mm.

Q Okay. What were the total gross revenues for DuraSeal in

2021?

A I believe just under $400,000.

Q And DuraSeal provides permanent sealing services for wood and concrete?

A Correct.

Q So the same services that EverSeal provides?

A Correct.

Q Does it offer the same 25 year warranty that EverSeal offers?

A That's extended by the manufacturer. So, yes.

Q Okay. Because they're both using the same products, applying the same products.

A Correct.

Q So the same --

A Kind of like a painting company using Sherwin-Williams paints.

Q And do you maintain a website at www.durasealit.com?

A Correct.

Q And one of the website's catch phrase is don't stain it DuraSeal it?

A Correct.

Q And so, from the June, July time frame to November were you selling for both EverSeal and DuraSeal at the same time?

A With my previous testimony, yes. I ran approximately 12 appointments for DuraSeal and approximately 400 appointments

for EverSeal.

Q How did you delineate between giving an appointment to your new company versus the company you were working for at that time?

A Well, I mean, one was assigned leads coming from EverSeal at a set schedule, the other was appointments coming in via, you know, phone call or web form for DuraSeal.

Q Are you ever aware of EverSeal and DuraSeal submitting bids on the same project?

A Mm-mm.

Q You are?

A Yes.

Q And who would have been submitting those bid on behalf of each company?

A Well, primarily I was -- if there was -- primarily I was running appointments for EverSeal. So, it was rare that I was running appointments for DuraSeal in the first place. So, just by the sheer numbers. But I also had sales rep Bailey Morledge (phonetic) in the Charlotte area that was running appointments on behalf of DuraSeal.

Q Okay. So, it's your testimony that a sales rep for your new company was bidding on the same projects that you were bidding on, on behalf of EverSeal?

A I mean, if I had to quantify it I would say that happened less than 15 times over five months.

Q Okay. But you're saying it happened on numerous occasions.

A Yes. But not as a result of me representing EverSeal and saying hey, have you heard about DuraSeal and diverting customers to them. It was a customer called EverSeal, same customer called DuraSeal.

Q Did your sales reps know that you were submitting bids for the same job they were submitting bids on?

A That is possible. Yes.

Q But you don't know whether they -- you never -- did you disclose the fact that you were also submitting a bid for --

A There were probably four or five instances where I had, you know, presented on behalf of EverSeal initially and then a customer would later call in to DuraSeal to request an estimate. And I would advise the customer that, you know, because I've created both sales presentations both the presentation I was using at EverSeal and the DuraSeal presentation I would advise them to, you know, don't run through the presentation just talk about the product.

Q And if you can recall when DuraSeal and EverSeal are bidding on the same projects who -- generally speaking who end up winning those bids?

A I don't have the information or access to the information on the EverSeal side, but, you know, I know of projects going both ways. And again, we're talking about maybe ten projects

total.

Q And you had access to EverSeal's pricing information when your DuraSeal company is bidding on the same projects.

A Yes.

Q You have access to --

A They provided pricing information to every customer as part of the sales presentation as well.

Q You testified earlier -- I don't want to mischaracterize what you said, but, you know, you said that if I want to go out I could go buy five gallon drum of sealant and I could seal it myself.

A Correct.

Q Right. And so from what I understand from your testimony that it doesn't take a lot of technical expertise to apply this product correctly.

A That's correct.

Q Do you tell your customers that when you're selling the product?

A We explain the process, but we don't -- I mean, we don't tell them that it's not rocket science. We explain the process as far as the washing and the rinsing and the application of the sealant.

Q Are you familiar with DuraSeal website?

A Mm-mm.

Q Are you familiar with the frequently asked questions on

there?

A Mm-mm.

Q There's -- in response to one of the frequently asked questions on their website I believe it's why haven't I heard of DuraSeal before, the sealant product? Or, the website says, quote, there are only a handful of authorized applicators that have the training and specialized equipment required to apply the product correctly to achieve such long-lasting results. So, if anyone can just go and put it on that's -- your website's saying there's a technical -- there's technical equipment, there's a technical process. So, I'm a little confused as to which one it is.

A Right. And EverSeal would say the same thing. I mean, they -- I don't know the cost to bill out their trucks, but I mean, we invested $50,000 to bill out a trailer to make it most efficient and most productive to be able to apply the product. Now, back to your example. Yes, you could buy the product. You could rent a pressure washer. You could get a pump sprayer and apply the product. It's not going to be as efficient as our process and probably not done as thoroughly. But we invest heavily in maximizing the productivity of our production units.

Q And the product and the company of DuraSeal is marketed with this that your company has the training and has the special equipment needed to make sure it's done correctly.

A Yeah. Well, not in the marketing materials. No. We

don't say it's specialized equipment in any of the marketing materials.

Q But on the website I thought you said.

A Okay.

Q Is that --

A We do use --

Q -- accurate?

A -- different equipment than a homeowner would use. You would not invest $50,000 to apply this product to your deck.

Q And since DuraSeal started in the summer of 2021 DuraSeal has not stopped operating at anytime.

A We did, because we had a couple days of temporary restraining order from the Tennessee court prior to them being aware of the bankruptcy filing.

Q Okay. So, it's your testimony that once you became aware of the order you stopped for a few days, but reopened for business shortly thereafter.

A Correct.

Q And you're operating today.

A Correct.

Q You're actively soliciting business today.

A Correct.

Q And that's in competition with EverSeal, is that right?

A To the extent that if customers would call both companies.

Q It's the same market, right? Both companies are trying to

sell their services and products for permanent sealing solutions, is that right?

A Correct.

Q Are you familiar with Tim Lasaro?

A I am.

Q And did he work under you at EverSeal?

A Correct. Well, as an independent contractor.

Q And you hired him to work with DuraSeal, is that right?

A Correct.

Q And you're aware that he submitted a sworn declaration in support of EverSeal's motion in the Tennessee action?

A Mm-mm.

MR. ANDERSON: Your Honor, may I approach?

THE COURT: You may.

Q Mr. Halferty, do you recognize this document?

A Yes.

Q Could you tell the Court what it is?

A It is the confidentiality agreement signed at the beginning of my independent contract relationship with EverSeal.

Q And could you flip to Page 2, please?

A Mm-mm.

Q Is that your signature?

A It is.

Q And is this a true and accurate copy of the

 confidentiality agreement?

A I believe so. Yes.

Q And as part of that agreement did you agree to keep company information described as confidential information confidential?

A Yes. That's the basis of the agreement.

Q And the agreement restricts the disclosure of or use of confidential information, does it now?

A Correct.

Q And as part of this agreement you agree that if a party breaches the agreement the non-breaching party would be entitled to a preliminary and/or permanent injunction to prevent the continuation of such harm, would you not?

A Correct. If I may add that with our response which has not been filed pending this hearing we have grounds for breach on behalf of the plaintiff.

Q And the agreement provides that you must keep -- you cannot use the confidential information for a two year period after the termination of your business arrangement with EverSeal, is that right?

A That is also correct.

Q And it also includes a two year covenant not to compete following the termination of the agreement with EverSeal, is that right?

A Correct.

MR. ANDERSON: Your Honor, I have no further questions.

THE COURT: Okay. Any redirect?

MR. SASSER: Briefly.

REDIRECT EXAMINATION

BY MR. SASSER:

Q Mr. Halferty, you mentioned this issue about -- why do you believe that the confidentiality agreement was induced improperly?

A At the time of hiring Mr. Nelson owner of EverSeal misrepresented, you know, the size of EverSeal, I believe the length of time that he had been involved in this industry, the number of trucks that were out producing, the number of markets that he was in leading me to believe that it was a much bigger company than it was at the time. In addition -- well, that's -- yeah. I'm sure we'll get there.

MR. BREWER: No more questions.

THE COURT: Okay. Any recross?

MR. ANDERSON: No, Your Honor.

THE COURT: Okay, you can step down. Anything further, Mr. Sasser?

MR. SASSER: No more evidence, Your Honor.

THE COURT: Okay. I'll hear your argument, Mr. Anderson.

MR. ANDERSON: Thank you, Your Honor. I'd like to

just start by admitting the confidentiality agreement.

THE COURT: Is there any objection?

MR. SASSER: No objection.

THE COURT: It's admitted.

MR. ANDERSON: Thank you, Your Honor. And again, we're here on an emergency basis seeking to lift the stay to allow the District Court action in Tennessee to proceed so that EverSeal can obtain injunctive relief against the debtor. Your Honor, the debtor's testimony is that he's actively competing against EverSeal in the market. He started a company while working with EverSeal that was competing on the same jobs. I'm not really sure exactly how that would work, but it was happening. And he had access to EverSeal's confidential information, pricing information, that sort of thing that would give his company advantage in the market knowing what EverSeal's processes and pricing was.

And so, you know, when looking at again the Robins factors for granting relief from stay we're not here on whether there should be an injunction at all it's just whether we should be allowed to proceed in Tennessee to seek that injunction. Again, this is a Tennessee contract law issue that a Tennessee court is well versed in. I think we're talking more about, you know, we're not trying to prevent the debtor from making any sort of arguments that he wants to make or present any evidence he wants to present in opposition of the

agreement. We just think it would be better served to be done in Tennessee.

It's not a situation where we're going to -- it's, you know, this is just for the injunctive piece of it. We're not talking seeking to enforce monetary damages or to take property from the estate. It's clearly to seek the equitable injunctive relief in order to prevent the ongoing harm which is ongoing. This is -- we're getting into EverSeal's busy season here where sales go from $100,000 a month to a million dollars a month. And so everyday that Mr. Halferty's out there competing in the market it's ongoing harm to EverSeal which is why a Tennessee court felt it was necessary to enter the temporary restraining order in the manner in which it did. And we would ask to be allowed to proceed in that action.

THE COURT: Thank you.

MR. SASSER: Your Honor, there's counts in the Tennessee action. There's a breach of contract, there's the breach of fiduciary duty, and then there's the intentional interference with business relations. And what we have is a situation where again, the monetary claim with probably dischargeability claim along with the injunctive relief it's all part of a single package. They can get to the same relief here. They just have to remove the action or just bring an action here meaning the bankruptcy rules clearly allow this kind of injunctive, anticipate in the adversary proceeding rule

you can seek injunctive relief in a bankruptcy court.

But the proper venue is here. It's much more efficient. They're not being harmed at all. I mean, Tennessee, North Carolina the attorney that was going to do the case was in Missouri and they were coming in -- they could come into North Carolina just the same as they can come into Nashville, assuming, you know, some kind of in-person, you know, it's necessary to come in person.

I think that the efficiencies are to just leave it here, let them do whatever they feel like they need to do, and then Your Honor will be able to evaluate all the issues including the claim amount, including any kind of dischargeability issues, whether or not injunctive relief is appropriate. And one thing we have to do I think we have to take a skeptical view of the fact that EverSeal is basically trying to put a competitor out of business. Now clearly DuraSeal shouldn't be stealing things from EverSeal. We all agree that that would be wrong and that would be improper. And maybe even after we heard evidence after a little bit more things can be vetted out Your Honor might say that's what needs to happen, you need to shut down, it's possible. But that would be -- we don't think that's going to happen, but it could.

But I think that that should all be heard here. This is where the territory was. This is where Mr. Halferty has

been a long time. And, you know, I would still say there's no evidence -- all we know is that there was a small amount of both companies bidding on the same job. But that doesn't mean that they were at all damaged by that. And it doesn't mean that, and again, what we saw was -- the evidence was Mr. Halferty was still the number one producer for this company even in October. So, this idea that they were somehow damaged or there was some kind of collusion going on.

And again, query on an independent contractor means that, you know, that's -- there's a little bit of a question mark there in terms of what loyalty there was. But there was no hard evidence that said that somehow they had been damaged. And there's no hard evidence there's any ongoing damage. And again, to me that would be the most powerful argument. I could see if he said you are actively taking our leads. But the evidence was to the contrary. They're generating their own leads, they've spent a lot of money. Not only do you have the fact that Mr. Halferty of course would like to make a living. You've got, you know, he's got his installation people, he's got customers here. There'd be a lot of damage here in North Carolina. So, this is a very fine place to have this matter of venue.

THE COURT: All right. Well, I don't see any reason why we should lift the stay. I think it's all applicable right here. There's nothing magical about these confidentiality or

non-compete agreements that we haven't seen a gazillion times before. There are some aspects that deal with the estate and we pay with the creditors. So, if you put this debtor out of business then his chance of reorganization under Chapter 13 are gone. And so I don't think that's appropriate at all.

From the testimony I heard I do think there's a question whether there was any use of that information. To me if it's available on the website and the customer can buy it and it's not a sole distributorship, exclusive distributorship I think that somehow affects the teeth of the confidentiality agreement which has been, I guess, admitted into evidence as Exhibit Number A, letter A.

I have some concerns that it's a -- that the non-compete is for two years and he didn't work for him for two years. That's a little bit unusual. But at any rate I'm not making any judgment on that whatsoever. The automatic stay, the filing precludes the temporary restraining order so there is no restraining order and there's not going to be, because I'm not going to lift the stay. You're more than welcome, Mr. Anderson, to remove the case here and let's hear it on the merits. Get your witnesses in here and let them be cross examined and not just by an affidavit, and we'll figure it out, flush it all out here, and get the information.

So, I'm not going to lift the automatic stay. So, I'll enter an order denying the motion. Thank you.

MR. ANDERSON: Thank you.

MR. SASSER: Thank you, Your Honor.

* * * * *

**C E R T I F I C A T I O N**

We, KELLI PHILBURN, and KIMBERLY UPSHUR court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.

/s/ Kelli Philburn

KELLI PHILBURN

/s/ Kimberly Upshur

KIMBERLY UPSHUR

J&J COURT TRANSCRIBERS, INC. DATE: March 2, 2022

## CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2022, a true and correct copy of the foregoing document was sent via this Court's ECF notification system and/or first class mail to the following parties:

William E. Brewer, Jr.
Travis Sasser
Sasser Law Firm
2000 Regency Parkway, Suite 230
Cary, NC 27518
*Counsel for Debtor*

US Bankruptcy Administrator
Eastern District of North Carolina
434 Fayetteville Street, Suite 640
Raleigh, NC 27601

Stephen B. Halferty
1132 Shadow Lake Dr.
Raleigh, NC 27615

FOX ROTHSCHILD LLP

By: /s/ Brian R. Anderson
Brian R. Anderson
N.C. State Bar No. 37989
230 N. Elm St., Suite 1200
Greensboro, NC 27401
branderson@foxrothschild.com
(336) 378-5205