**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION**

| | | |
|---|---|---|
| IN RE:<br><br>    **STEPHEN BRADLEY HALFERTY,**<br><br>    Debtor. | )<br>)<br>)<br>)<br>) | **Case No. 22-00101-5-DMW** |
| **EVER-SEAL, INC.,**<br><br>    **Plaintiff/Counter-Defendant,**<br><br>v.<br><br>STEPHEN   BRADLEY   HALFERTY,   d/b/a<br>DURASEAL,<br><br>    **Defendant/Counter-Claimant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Adv. Proc. No. 22-00050-5-DMW**<br><br>**JURY DEMAND** |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT**

In accordance with Local Bankruptcy Rule 7007-1(a), Plaintiff Ever-Seal, Inc. submits this memorandum in support of its motion for partial summary judgment. Because there is no genuine dispute that Defendant Stephen Bradley Halferty breached an agreement with Ever-Seal and interfered with business relationships, the motion should be granted.

Halferty was formerly an estimator (i.e., salesperson) and sales manager for Ever-Seal. He signed an agreement promising, under Tennessee law, that he would not compete against Ever-Seal. But while working for Ever-Seal, Halferty created his own company and began competing directly against Ever-Seal. That competition has continued since his termination. Halferty has been usurping business opportunities for his own personal benefit. Accordingly, partial summary judgment should be granted in favor of Ever-Seal declaring liability for Halferty's conduct.

## FACTUAL AND PROCEDURAL BACKGROUND

Ever-Seal provides wood and concrete restoration and permanent sealing services to individuals and businesses throughout the Southeastern United States, including in North Carolina. Ver. Compl. ¶ 10.[1]  To provide these services, Ever-Seal uses a third-party's product called Seal-It.  *Id.* ¶¶ 17-18.  Ever-Seal is one of only a few companies in the United States authorized to offer and install Seal-It.  *Id.* ¶ 19.

In May 2020, Ever-Seal engaged Halferty as an estimator to cover Ever-Seal's sales territory in North Carolina.  *Id.* ¶ 22; Hrg. Tr. 16:15-17, 17:1-2.[2]  Although he made sales in some other states, Halferty's primary sales territory was the state of North Carolina.  Dep. pp. 120-21.[3]

At the commencement of his working relationship with the company, Halferty executed a Confidentiality Agreement with Ever-Seal.  Ver. Compl. ¶ 36; Ver. Compl. Ex. A; Hrg. Tr. 36:15-24.  Halferty understood the terms of the Confidentiality Agreement and did not ask any questions about them.  Dep. p. 82.

Among other things, the Confidentiality Agreement prohibits Halferty from competing against Ever-Seal for a period of two years following his termination (the "Non-Compete Clause"). Specifically, after the Agreement limits the use of confidential information and materials for a period of two years, the Non-Compete Clause provides:

> Furthermore, employees, contractors, or associates of Ever-seal Inc., upon voluntary or involuntary termination of employment or contract, agree to not enter employment or contract with, nor advise, another company or business entity that

---

[1] The Complaint was verified by Ever-Seal's CEO and Treasurer, Steve Nelson.

[2] A true and accurate copy of the Transcript of the February 23, 2022 hearing on Ever-Seal's Emergency Motion for Relief from Stay was attached as Exhibit B to the Memorandum in Support of Plaintiff's Motion for Preliminary Injunction (Doc. 4).  This transcript is cited herein as "Hrg. Tr."

[3] True and accurate excerpts from the transcript of Halferty's deposition are attached as Exhibit A hereto and cited herein as "Dep."

is in direct or indirect competition with Ever-Seal Inc. or any of its entities for the same two-year period thereafter.

Ver. Compl. Ex. A ¶ 3.

Ever-Seal trained Halferty on the techniques and processes it uses to permanently seal wood and concrete, apply its permanent sealing solution, and give its unique sales presentation. Ver. Compl. ¶¶ 26-27; Ans. and Counterclaim ¶ 14; Hrg. Tr. 17:10-15, 25:9-12.  In his role as estimator, Halferty's duties included attending sales appointments assigned to him by Ever-Seal, measuring projects and preparing bids, using Ever-Seal's presentation materials to sell Ever-Seal's services to prospective customers, answering prospective customer questions, and completing new customer paperwork.  Ver. Compl. ¶ 23; Ans. and Counterclaim ¶ 12.

Halferty was eventually promoted to sales manager, a role in which he was responsible for assisting sales representatives in each market area at the direction of Ever-Seal management while continuing to oversee his assigned sales territory in North Carolina.  Ver. Compl. ¶¶ 29-30.  As sales manager, Halferty's additional duties included reviewing each sale as it came in to ensure accuracy, training and working with sales team members in different sales territories, and responding to customer complaints and resolution plans pertaining to estimates.  *Id.* ¶ 31.  In this role, Halferty learned Ever-Seal's larger marketing and growth plans and strategies, as well as Ever-Seal's methods to provide services efficiently, reliably, and at an affordable price.  *Id.* ¶ 33.

In both of these roles (estimator and sales manager), Halferty was responsible for communicating directly with prospective customers on behalf of Ever-Seal in order to secure new business.  *Id.* ¶¶ 23-24, 30, 35.  Halferty served as the prospective customer's main point of contact at all times between the initial sales appointment and the customer entering into a contract with Ever-Seal.  *See id.* ¶¶ 23-24.

In November 2021, Ever-Seal terminated its relationship with Halferty due to Halfery failing to show up to scheduled appointments with customers. *Id.* ¶ 44. A few weeks later, Ever-Seal learned that several months prior to his termination, Halferty had formed and begun competing with Ever-Seal through a company he called "DuraSeal." *Id.* ¶¶ 47-49.

Even though he was still being compensated by Ever-Seal and supposed to be benefitting that company, Halferty had formed DuraSeal in or around June 2021 to compete against Ever-Seal. *Id.*; Ans. and Counterclaim ¶ 27; Hrg. Tr. 19:23-20:3, 29:11-13. Importantly, Halferty admitted under oath that he began DuraSeal while he was still working for Ever-Seal and that he solicited sales on behalf of both companies for several months while still working for Ever-Seal. Hrg. Tr. 21:15-21, 29:14-24. Halferty did not inform Ever-Seal about his competing company; he kept that a secret. Dep. pp. 73-74, 77.

Halferty also admitted that DuraSeal is a direct competitor of Ever-Seal. Dep. p. 125. DuraSeal, like Ever-Seal, provides permanent sealing services for wood and concrete backed by a 25-year warranty. Ver. Compl. ¶¶ 18, 50; Ans. and Counterclaim ¶ 27; Lucero Decl. ¶ 14; Hrg. Tr. 30:3-13.[4] DuraSeal, like Ever-Seal, utilizes Seal-It for its services. Ver. Compl. ¶ 51; Ans. and Counterclaim ¶ 27; Lucero Decl. ¶ 14; Hrg. Tr. 24:21-24. DuraSeal, like Ever-Seal, operates throughout North Carolina. Ver. Compl. ¶ 52; Ans. and Counterclaim ¶ 27; Lucero Decl. ¶ 13; Hrg. Tr. 28:22-29:3; Dep. pp. 95-96. DuraSeal competes directly against Ever-Seal by submitting bids on the same projects, marketing in the same areas, and offering the same permanent sealing services using the same product, processes, and representations. Ver. Compl. ¶¶ 50-60; Lucero

---

[4] The Declaration of Tim Lucero (another of Ever-Seal's former estimators) was attached as Exhibit A to the Memorandum in Support of Plaintiff's Motion for Preliminary Injunction (Doc. 4). This declaration is cited herein as "Lucero Decl."

Decl. ¶¶ 8-11, 13-17; Hrg. Tr. 31:8-12.  Two of Duraseal's employees even came from Ever-Seal. Dep. pp. 93-94.

Halferty's conduct has damaged and is continuing to damage Ever-Seal in the form of lost business, customer relationships, and goodwill, as well as lost profits and administrative, marketing, recruiting, and training costs.  Ver. Compl. ¶¶ 65-72, 87-88, 103-104.  Halferty has sourced numerous jobs directly from Ever-Seal, and he is continuing to advertise and sell DuraSeal's competing services in at least North Carolina and South Carolina.  *Id.* ¶ 69; Lucero Decl. ¶ 13.  Halferty testified that he personally sold at least $13,000 worth of work for DuraSeal while he was still working for Ever-Seal and that there was at least one other DuraSeal representative selling at the same time.  Hrg. Tr. 23:2-7.  Halferty also testified that DuraSeal had approximately $400,000 in gross revenue in 2021.  *Id.* at 29:25-30:2.  Halferty could have steered that business to Ever-Seal.  Dep. p. 79.  Further, at the time of the hearing Halferty testified that DuraSeal had at least 20 to 25 jobs lined up and DuraSeal was still actively soliciting business. Hrg. Tr. 24:6-9, 35:19-22.  All of these sales should have gone to Ever-Seal (and presumably would have but for Halferty's misconduct).

On February 8, 2022, Ever-Seal filed a complaint against Halferty in the United States District Court for the Middle District of Tennessee.  The Tennessee court entered a temporary restraining order.  *Ever-Seal, Inc. v. Halferty*, No. 3:22-cv-00082, 2022 WL 418692 (M.D. Tenn. Feb. 10, 2022).  In that order, the Tennessee court explained that the parties' Confidentiality Agreement, "including its non-competition clause, likely is an enforceable contract under Tennessee law."  *Id.* at *5.  Specifically, the Non-Compete Clause "is reasonable in its two-year duration."  *Id.*  Without enforcement of the Non-Compete Clause, Ever-Seal "would risk losing the investment of training its employees and developing current and prospective business

relationships," and "former employees could unfairly use the benefits they gained while employed by [Ever-Seal] in order to undercut [Ever-Seal's] business for personal gain." *Id.*

Unbeknownst to Ever-Seal, Halferty had filed a Chapter 13 bankruptcy petition a few weeks earlier. *See* Ver. Compl. ¶ 7; Ans. and Counterclaim ¶ 2. When the Tennessee court was informed of the bankruptcy case, the Tennessee court stayed further proceedings in the matter. Doc. 22 in Case No. 3:22-cv-00082.

On March 17, 2022, Ever-Seal commenced this adversary proceeding against Halferty via a Verified Complaint. Doc. 1. Ever-Seal asserted claims for breach of contract and intentional interference with business relations under Tennessee law. *Id.* Ever-Seal sought compensatory and punitive damages as well as injunctive relief. *Id.*[5]

On July 20, 2022, Ever-Seal filed a motion to withdraw the reference of its claims against Halferty from the bankruptcy court. Doc. 29. On March 2, 2023, the district court denied the motion to withdraw. Doc. 46. After several amendments to the scheduling order, discovery in this matter closed on April 7, 2023. *See* Doc. 42.

## ARGUMENT

### I.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Fed. R. Bankr. P. 7056. Such a motion does not require the Court to weigh the evidence but rather "to determine

---

[5] On May 18, 2022, Ever-Seal filed a separate complaint against DuraSeal. Once again, the Tennessee court entered a temporary restraining order. *Ever-Seal, Inc. v. DuraSeal, Inc.*, No. 3:22-cv-00365, 2022 WL 1697391 (M.D. Tenn. May 26, 2022). That order was subsequently converted into a preliminary injunction. Doc. 34 in Case No. 3:22-cv-00365. On August 23, 2022, upon DuraSeal's motion, the Tennessee court transferred the matter against DuraSeal to this Court. *Ever-Seal, Inc. v. DuraSeal, Inc.*, No. 3:22-cv-00365, 2022 WL 3599519 (M.D. Tenn. Aug. 23, 2022).

whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Once the moving party makes a sufficient showing of the basis for its motion, the nonmoving party must go beyond the pleadings and identify specific facts showing a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *In re Coley*, 609 B.R. 298, 307 (Bankr. E.D.N.C. 2019).

## II.  EVER-SEAL IS ENTITLED TO SUMMARY JUDGMENT ON ITS CLAIM FOR BREACH OF CONTRACT

### a.  Choice of law

Federal courts, including bankruptcy courts, generally apply the forum state's choice of law rules, absent any overriding federal policy. *In re Meritt Dredging Co.*, 839 F.2d 203, 205-06 (4th Cir. 1988). Under North Carolina law, contractual choice of law provisions are generally enforceable. *Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co.*, 386 F.3d 581, 600-01 (4th Cir. 2004); *Tanglewood Land Co. v. Byrd*, 299 N.C. 260, 262, 261 S.E.2d 655, 656 (1980). "Choice of law provisions are not contrary to the laws of [North Carolina]." *Bueltel v. Lumber Mut. Ins. Co.*, 134 N.C. App. 626, 631, 518 S.E.2d 205, 209 (1999). Instead, "when a choice of law provision is included in a contract, the parties intend to make an exception to the presumptive rule that the contract is governed by the law of the place where it was made." *Id.*

Here, the parties agreed that their Confidentiality Agreement would be interpreted under Tennessee law. Ver. Compl. Ex. A ¶ 9 ("This Agreement and the validity, interpretation, performance and enforcement hereof shall be governed by the domestic laws of the State of Tennessee without giving effect to the principles of conflicts of laws thereof."). Accordingly, the remainder of the argument cites to Tennessee authorities.

Further, this choice of law provision makes sense, because Ever-Seal is a Tennessee corporation with its principal place of business located in Tennessee. Ver. Compl. ¶ 9; Ans. and

Counterclaim ¶ 4. Thus, the parties had a reasonable basis for their agreement to resolve any dispute under the law of Tennessee.

### b. Elements

Under Tennessee law, a claim for breach of contract requires an enforceable contract, non-performance of that contract amounting to a breach, and damages caused by the breach. *See Bridgestone America's, Inc. v. IBM Corp.*, 172 F. Supp. 3d 1007, 1019 (M.D. Tenn. 2016); *Fed. Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011). Those elements are present here.

### c. An enforceable contract

Under Tennessee law, a covenant not to compete is enforceable if a company has a protectable business interest and the covenant is "reasonable under the circumstances." *Vantage Tech., LLC v. Cross*, 17 S.W.3d 637, 644 (Tenn. Ct. App. 1999) (citing *Hasty v. Rent-A-Driver, Inc.*, 671 S.W.2d 471, 472-73 (Tenn. 1984)).

A company has a protectable business interest if there are "special facts . . . over and above ordinary competition" indicating that without the covenant, a worker would "gain an unfair advantage in future competition" with the business. *Hasty*, 671 S.W.2d at 473. Relevant factors in determining whether a worker would have such an unfair advantage include 1) whether the business provided the worker with specialized training; 2) whether the worker was given access to trade or business secrets or other confidential information; and 3) whether the business' customers tend to associate the business with the worker due to the worker's repeated contacts with the customers on behalf of the business. *Vantage*, 17 S.W.3d at 644 (explaining that "[t]hese considerations may operate individually or in tandem to give rise to a properly protectable business interest").

8

A covenant not to compete is reasonable when the time and territorial limits are "no greater than is necessary" to protect the business interest of the company. *Allright Auto Parks, Inc. v. Berry*, 409 S.W.2d 361, 363 (Tenn. 1966).[6] The reasonableness standard balances the threatened danger to the company's protectable interest in the absence of a non-competition covenant, the economic hardship imposed on the worker, and whether or not the covenant harms the public interest. *Vantage*, 17 S.W.3d at 644, 647 (citing *Allright Auto*, 409 S.W.2d at 363).[7]

Here, Ever-Seal has a protectable business interest over and above ordinary competition. As the Tennessee court already explained, without the Non-Compete Clause, a worker would gain an unfair advantage in future competition with Ever-Seal. As discussed above, Ever-Seal trained Halferty on its processes and techniques in not only performing sealing services but also marketing to customers.[8] Ver. Compl. ¶¶ 26-27. Ever-Seal provided Halferty with access to its confidential and trade secret information, including information on Ever-Seal's leads, inquiries, and prospective business opportunities and customer relationships, Ever-Seal's marketing and growth strategies, and Ever-Seal's confidential and proprietary sales process and presentation book. *Id.* ¶

---

[6] Under Tennessee law, non-compete covenants are equally applicable to employees and independent contractors. *See Baker v. Hooper*, No. 03A01-9707-CV-00280, 1998 WL 608285, at *3-4 (Tenn. Ct. App. Aug. 6, 1998). Therefore, whether Halferty was an employee or independent contractor of Ever-Seal is irrelevant. *See Thuy-T-Lam v. Tuan Ngoc Bui Le*, No. E200802491COAR3CV, 2009 WL 2047290, at *4 n.3 (Tenn. Ct. App. July 15, 2009) ("Although the nail technicians were technically independent contractors and not employees, this distinction has no bearing on the present matter.").

[7] There was adequate consideration supporting the Confidentiality Agreement because it was executed contemporaneously with the commencement of Halferty's working relationship with Ever-Seal. *Cent. Adjustment Bureau, Inc. v. Ingram*, 678 S.W.2d 28, 33 (Tenn. 1984) (holding that future employment of an at-will employee constitutes adequate consideration when the agreement is signed prior to, contemporaneously with, or shortly after employment begins).

[8] Indeed, Halferty touts on the DuraSeal website that "there are only a handful of authorized applicators that have the training and specialized equipment required to apply the product correctly to achieve such long-lasting results." Hrg. Tr. 33:23-35:4.

43.  As such, Halferty had a level of knowledge not publicly known or readily available that was learned as a consequence of his work with Ever-Seal.  In addition, Halferty, as an estimator (and sales manager) on behalf of Ever-Seal, was the "face" of Ever-Seal to potential customers.  He was many potential customers' primary point of contact and was privy to private information about each such customer and project, including the customer's needs, wants, likes, and dislikes, and Ever-Seal's private bid information.  *Id.* ¶¶ 23-24, 30-31, 32, 35.  He was also the point of contact for potential customers.  *See id.* ¶¶ 23-24.  Considering these factors, Ever-Seal has a protectable business interest.

Moreover, the Non-Compete Clause is reasonable under the circumstances.  Again, as the Tennessee court found, if the covenant is not enforced, Ever-Seal stands to lose its investment in training workers like Halferty, its investment in the development of customer relationships, its effort expended in gathering information concerning customer preferences, its goodwill, and its prospective business and customer relationships.  By contrast, if the covenant is enforced, workers like Halferty can still work as a salesperson or estimator for any other non-competing company.  Under Tennessee law, the threatened danger to Ever-Seal in the absence of enforcement outweighs the economic hardship imposed upon workers like Halferty by enforcement of the covenant.  In addition, the public interest does not militate against enforcement of the covenant; to set the covenant aside would allow workers like Halferty to unfairly use the benefits bestowed upon them and would create a disincentive for Ever-Seal to properly train and inform its sales force—which would not be in the public interest.

The scope of the Non-Compete Clause is also reasonable.  The temporal limitation is two years.  Ver. Compl. Ex. A ¶ 3.  This is a reasonable amount of time under the circumstances, and Tennessee courts regularly enforce restrictions of such duration.  *See, e.g.*, *Total Car Franchising*

10

*Corp. v. L&S Paint Works, Inc.*, 981 F. Supp. 1079, 1082 (M.D. Tenn. 1997) (finding a two-year time limitation reasonable and noting that "covenants lasting for two to five years have all been found to be of reasonable duration"); *Powell v. McDonnell Ins., Inc.*, No. 02A01-9608-CH-00176, 1997 WL 589232, at *6-7 (Tenn. Ct. App. Sept. 24, 1997) (reversing the trial court's reduction of a non-compete time limitation from two years to one year and collecting cases indicating that a two-year duration is reasonable).[9]  Further, under Tennessee law, this time period should be tolled while the breach is ongoing.  *Corp. Exp. Off. Prod. v. Warren*, No. 01-2521 DBRE, 2002 WL 1901902, at *17 (W.D. Tenn. May 24, 2002) (tolling a covenant not to compete based on when the employee began competing).

Similarly, the geographic scope of the parties' agreement is reasonable given the product and services offered by Ever-Seal as well as Halferty's roles.  *See, e.g., Dabora, Inc. v. Kline*, 884 S.W.2d 475, 478 (Tenn. Ct. App. 1994) (holding that a geographic restriction that prohibited employees from working with the employer's competitors in the entire country was reasonable under the circumstances given the employer's limited scope of business).  Ever-Seal is one of only a few companies in the United States authorized to offer and install Seal-It.  Ver. Compl. ¶ 19. The restriction on Halferty's competition is fairly narrow in application because it only prevents him from associating with companies that use the same product.  *See Thompson, Breeding, Dunn, Creswell & Sparks v. Bowlin*, 765 S.W.2d 743, 745-76 (Tenn. Ct. App. 1987) (explaining that the need for a geographical limitation decreases as a limitation regarding class of persons with whom

---

[9] Under Tennessee law, the fact that Halferty worked for Ever-Seal for 18 months does not render the two-year time limitation unreasonable.  *See, e.g., Dill v. Cont'l Car Club, Inc.*, No. E2013-00170-COA-R3CV, 2013 WL 5874713, at *15, 17 (Tenn. Ct. App. Oct. 31, 2013) (holding that a two-year limitation was reasonable even though the defendant worked for only 14 months); *Flying Colors of Nashville, Inc. v. Keyt*, No. 01-A-019103CH00088, 1991 WL 153198, at *4 (Tenn. Ct. App. Aug. 14, 1991) (holding that a one-year limitation was reasonable even though the defendant worked for only six months).

competition is prohibited increases); *Interstate S. Packaging, LLC v. Korman*, No. 2:20-CV-207, 2021 WL 5161910, at \*12 (E.D. Tenn. Sept. 5, 2021) ("When considering whether a noncompete is reasonable, the geographic breadth of the provision must be read in conjunction with the scope of activities prohibited over a given area."). The scope is further appropriate under the circumstances given that Halferty, in his role as sales manager, assisted in each of Ever-Seal's market areas. Ver. Compl. ¶¶ 30-32. At a minimum, the Non-Compete Clause should include every state in which Ever-Seal does business—including North Carolina.

Halferty knowingly and voluntarily entered into the Confidentiality Agreement with Ever-Seal at the commencement of his working relationship with the company, and the Non-Compete Clause contained therein is valid and enforceable.

### d.  Breach

Halferty formed DuraSeal and has been working for that company since before his termination from Ever-Seal. Ver. Compl. ¶¶ 47-64; Lucero Decl. ¶¶ 5-11. DuraSeal sells the same products and services as Ever-Seal in the same region. Ver. Compl. ¶¶ 50-52, 58-60; Lucero Decl. ¶¶ 8-18. In fact, DuraSeal has provided bids on the exact same projects as Ever-Seal—even when Halferty was still working for Ever-Seal. Ver. Compl. ¶¶ 58; Lucero Decl. ¶¶ 8-11, 15-16. Halferty admitted under oath that DuraSeal continues to operate and solicit business in competition with Ever-Seal, as "it's the same market" and "[b]oth companies are trying to sell their services and products for permanent sealing solutions." Hrg. Tr. 35:19-36:3; *see also* Ans. and Counterclaim ¶ 39 (admitting that Halferty "is presently competing with Ever-Seal in at least North Carolina and South Carolina"). Accordingly, Halferty has breached and continues to breach the parties' Confidentiality Agreement by working for DuraSeal (whether in an employment, contractual, or advisory capacity).

### e.  Damages

Halferty's breach of the Confidentiality Agreement has damaged and is continuing to damage Ever-Seal.  Ver. Compl. ¶¶ 65-72, 87-88, 103-104; *see also* Ver. Compl. Ex. A ¶ 8. Because the amount of damages has not yet been determined, partial summary judgment is appropriate.  *See* Fed. R. Civ. P. 56(a) (explaining that a party may move for summary judgment on a part of a claim); *In re Midsouth Golf, LLC*, 549 B.R. 156, 167 (Bankr. E.D.N.C. 2016) (noting that a motion for partial summary judgment was allowed and the amount of damages was an issue left for trial); *In re Coastal Plains Pork, LLC*, No. 09-08367-8-RDD, 2012 WL 5471102, at *2 (Bankr. E.D.N.C. Dec. 17, 2012) (similar); *In re Bodtmann*, No. 94-01512-5-ATS, 1996 WL 924767, at *1-2 (Bankr. E.D.N.C. Jan. 30, 1996) (similar).  Liability should be determined as a matter of law, and the issue of damages should go to trial.

### III.  EVER-SEAL IS ENTITLED TO SUMMARY JUDGMENT ON ITS CLAIM FOR INTENTIONAL INTERFERENCE

### a.  Choice of law

Like the claim for breach of contract, Tennessee law governs Ever-Seal's claim for intentional interference with business relations.  For such tort claims, North Carolina follows the choice of law rule *lex loci delicti*, which provides that the law of the place of the injury controls. *Cardiorentis AG v. IQVIA Ltd.*, 837 S.E.2d 873, 880 (N.C. 2020).  Ever-Seal is a Tennessee company, and it has suffered damages in Tennessee where its business is based.  *See id.* at 880-81 (applying Swiss law because the plaintiff suffered losses at its corporate home in Switzerland); *see also McElmurry v. Alex Fergusson, Inc.*, No. 1:04CV389, 2006 WL 572330, at *10 (M.D.N.C. Mar. 8, 2006) (applying North Carolina law to a claim of tortious interference because the injury "occurred in North Carolina where [the plaintiff's] business is based"); *Ferrante v. Westin St. John Hotel Co.*, No. 4:18-CV-108-D, 2020 WL 486198, at *6 (E.D.N.C. Jan. 29, 2020) (applying North

Carolina law to a claim of tortious interference because the plaintiff felt economic loss at his residence in North Carolina), *aff'd*, No. 20-1322, 2022 WL 396022 (4th Cir. Feb. 9, 2022).

### b. Elements

Under Tennessee law, a claim for intentional interference with business relations requires 1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; 2) the defendant's knowledge of that relationship; (3) the defendant's intent to cause the breach or termination of the business relationship; 4) the defendant's improper motive or improper means; and 5) damages resulting from the tortious interference. *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002). All of those elements are present here.[10]

### c. Business relationships with an identifiable class

Ever-Seal, which provides permanent wood and concrete sealing services, has prospective contractual relationships with individuals and businesses in need of those services. Ver. Compl. ¶ 91. That is, Ever-Seal has prospective business relationships with potential customers purchasing its sealing services. *See Trau-Med*, 71 S.W.3d at 701 n.4 (reiterating that relations protected by this tort include "any prospective contractual relations, except those leading to contracts to marry,

---

[10] Even if the Court were to apply North Carolina law to this claim, the required elements would still be satisfied. Under North Carolina law, a claim of tortious interference with prospective economic advantage "arises when a party interferes with a business relationship by maliciously inducing a person not to enter into a contract with a third person, which he would have entered into but for the interference, . . . if damage proximately ensues, when this interference is done not in the legitimate exercise of the interfering person's rights." *Schumacher Homes of N.C., Inc. v. Buchanan*, No. 121CV00260MOCWCM, 2021 WL 5566771, at *3 (W.D.N.C. Nov. 29, 2021) (quoting *Beverage Sys. of the Carolinas, LLC v. Associated Beverage Repair, LLC*, 784 S.E.2d 457, 463 (N.C. 2016)). Thus, the elements for the claim are: (1) a contract that would have been entered into but for the defendant's conduct; (2) the defendant knew of the contract; (3) the defendant intentionally induced the third person not to enter into the contract; (4) the defendant acted without justification; and (5) the plaintiff was damaged. *See Spirax Sarco, Inc. v. SSI Eng'g, Inc.*, 122 F. Supp. 3d 408, 421 (E.D.N.C. 2015).

if the potential contract would be of pecuniary value to the plaintiff" including "the opportunity of selling or buying land or chattels or services, and any other relations leading to potentially profitable contracts"); *Yoe v. Crescent Sock Co*., No. 1:15-CV-3-SKL, 2015 WL 13847410, at *13 (E.D. Tenn. Dec. 11, 2015) (explaining that a plaintiff need only identify "a class of third persons" for prospective business relationships and finding allegations sufficient when the plaintiff alleged the defendant interfered with prospective classes of customers including outdoor retailers); *PPG Indus., Inc. v. Payne*, No. 3:10-CV-73, 2012 WL 1836314, at *4 (E.D. Tenn. May 21, 2012) (holding allegations sufficient when the claimant identified prospective business relationships as potential paint-buying customers).

### d.   Halferty's knowledge of the relationships

Halferty, as a former estimator and sales manager at Ever-Seal, is aware of these business relationships.  Indeed, while at Ever-Seal, he was directly responsible for selling Ever-Seal's services to prospective customers and overseeing the sales team.  Ver. Compl. ¶¶ 19-21, 25-28, 36, 89.  This is sufficient to establish knowledge.  *See, e.g., Korman*, 2021 WL 5161910, at *17 (finding the defendants had substantial knowledge regarding business relationships at issue based on their past work for the plaintiff).  He further had access to Ever-Seal's historical and future appointment information for the entire sales and operations teams and was apprised of Ever-Seal's sales numbers and marketing and growth plans.  Ver. Compl. ¶¶ 33, 44.

### e.   Halferty's intent

Halferty intended to cause a breach or termination of Ever-Seal's prospective business relationships by sabotaging sales on behalf of Ever-Seal, soliciting Ever-Seal's potential customers that he learned of through his work for Ever-Seal and directing them to his separate competing company, using Ever-Seal's confidential and inside information to divert business to his separate

competing company, and otherwise inducing potential customers to use DuraSeal's services rather than Ever-Seal's services.  Ver. Compl. ¶¶ 47-64, 96, 100; Lucero Decl. ¶¶ 2-19.  Indeed, Halferty was actively competing against Ever-Seal while he was still working at the company, including by submitting bids on the same job.  There is no dispute that Halferty intended to recruit Ever-Seal's potential customers away from Ever-Seal and to DuraSeal. *See, e.g., Korman*, 2021 WL 5161910, at *17-18 (finding this element satisfied when the defendant intended to cause a breach of the plaintiff's business relationships by soliciting the plaintiff's customers whom defendants had come to know through work with the plaintiff and directing them to the defendant's competing business using insider information and misrepresentations).

### f.  Halferty's improper means

Halferty has used improper means to interfere with Ever-Seal's prospective business relationships by engaging in misrepresentations and deceit, unlawfully using confidential information, unfairly competing, and breaching his contractual duties to Ever-Seal (including the Non-Compete Clause).  Ver. Compl. ¶¶ 47-64, 94; Lucero Decl. ¶¶ 2-19.  Such conduct constitutes improper means under Tennessee law.  *See Trau-Med*, 71 S.W.3d at 701 n.5 (explaining that improper means are those that are illegal or independently tortious, such as fraud, misrepresentation or deceit, misuse of inside or confidential information, breach of a fiduciary relationship, and unethical conduct such as sharp dealing, overreaching, or unfair competition); *see also Kolstad v. Leehar Distributors, LLC*, No. 3:18-cv-00060, 2018 WL 6832086, at *7 (M.D. Tenn. Dec. 28, 2018) (explaining that in *Trau-Med*, the Tennessee Supreme Court "embraced a broad view of what can constitute improper motive and improper means").  Rather than a legitimate exercise of his own rights, Halferty has maliciously acted with a design to injure Ever-Seal and gain an advantage at Ever-Seal's expense.

16

### g. Damages

Halferty's intentional interference has damaged and continues to damage Ever-Seal.  Ver. Compl. ¶¶ 65-72, 87-88, 103-104.  Again, because the amount of damages has not yet been determined, partial summary judgment is appropriate.

## IV.    EVER-SEAL IS ENTITLED TO SUMMARY JUDGMENT ON HALFERTY'S PURPORTED COUNTERCLAIM

As a "Counterclaim," Halferty summarily alleged that Ever-Seal "has failed to pay" him. Ans. and Counterclaim at 3.  However, throughout the discovery period, Halferty has not expounded on this allegation or explained the calculation that he attached as Exhibit A to his Counterclaim.  In fact, in his deposition Halferty admitted that the numbers on his exhibit "aren't necessarily accurate."  (Dep. p. 52; *see also id.* p. 53 ("That – as I said, those – those numbers are not correct.")).    Moreover, Halferty confirmed that he was paid "one hundred percent commission."  (Dep. p. 28).  He has not identified any commission to which he was entitled that he was not paid.  Halferty also agrees he was not entitled to a bonus because he did not work for Ever-Seal through December 2021.  (Dep. pp. 39, 44-45).

Halferty is not entitled to pursue a claim simply because he alleged that he was not paid in some unknown way.  Accordingly, summary judgment should be granted on this purported Counterclaim.

## CONCLUSION

For the foregoing reasons, the motion for partial summary judgment should be granted, judgment should be entered in favor of Ever-Seal, Inc. and against Halferty as set forth above, and the amount of Ever-Seal's damages should be set for trial along with Ever-Seal's remaining claims.

Respectfully submitted this 21st day of April, 2023.

FOX ROTHSCHILD LLP

By: /s/ *Kip D. Nelson*
     Kip D. Nelson
     N.C. State Bar No. 43848
     Brian R. Anderson
     N.C. State Bar No. 37989
     230 N. Elm St., Suite 1200
     Greensboro, NC 27401
     knelson@foxrothschild.com
     branderson@foxrothschild.com
     Tel: (336) 378-5200

     *Attorneys for Ever-Seal, Inc.*

# **<u>EXHIBIT A</u>**

Stephen Halferty

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION
Case No. 22-00101-05-DMW
Chapter 13
Adv. Proc. No. 22-00050-DMW

```
IN RE:                        )
STEPHEN BRADLEY HALFERTY,     )
                              )
                Debtor.       )
---------------------------)
EVER-SEAL,INC.,               )
                              )
                Plaintiff,)
                              )
        v.                    )
                              )
STEPHEN BRADLEY HALFERTY      )
d/b/a DURASEAL,               )
                              )
                Defendant.)
---------------------------
```

V I D E O T A P E D

D E P O S I T I O N

O F

S T E P H E N   B R A D L E Y

H A L F E R T Y

In Raleigh, N.C.        Reported by:
May 4, 2022             Lisa S. Marion

Stephen Halferty

28

```
 1            you?

 2      A     If I looked at a list, I could probably recall

 3            them.  I no longer have access to any of my

 4            EverSeal e-mails.  That would probably make it easy

 5            to find, as well.  But I have no further contact

 6            with EverSeal customers.

 7      Q     When you worked at EverSeal, how were you paid?

 8      A     As a 1099 non-employee contractor, one hundred

 9            percent commission.  No salary, no base, no draws.

10            Responsible for my own gas and hotels.

11      Q     You were never reimbursed for your gas?

12      A     We had a gas bonus of thirty dollars for every

13            contract.

14      Q     What do you mean "per contract"?  Per contract

15            signed?

16      A     Correct.

17      Q     You were paid weekly, weren't you?

18      A     Correct.

19      Q     You were paid by EverSeal, right?

20      A     Correct.

21      Q     Did you get a paycheck, or you got direct deposit?

22      A     Direct deposit.

23      Q     Did you get any money -- did customers put down a

24            deposit when they signed a contract?

25      A     Yes.
```

Stephen Halferty

39

```
 1        Q     Why would you have received an extra bonus?
 2        A     The compensation included half a percent to one
 3              percent of total sales for the year to be paid at
 4              the company Christmas party.
 5        Q     Is that in writing anywhere?
 6        A     I do have the compensation structure.  Yes.
 7        Q     What does that look like?
 8        A     It looks like it was formed on a spreadsheet that
 9              delineates the commission based on sales milestones
10              on a monthly basis.
11        Q     Do you have a copy with you today?
12        A     I do not.
13        Q     Where is it?
14        A     At home.
15        Q     Do you work out of your home or out of an office?
16        A     Out of my house.
17        Q     Did you ever work out of an office for DuraSeal?
18        A     No.
19        Q     Do you agree with me that you have to be employed
20              in January to receive the bonus from the prior
21              year?
22        A     Well, I'd say through December.  I don't think in
23              January, but I'd say through December.  Yes.
24        Q     Okay.  And you left right after -- or before
25              Thanksgiving in 2021, right?
```

Stephen Halferty

44

1          Is that right?

2     A    Correct.  From basically July -- well, you know,
3          there is another week or week and a half in June.
4          But for essentially six months.

5     Q    And then in 2021 until you were let go in late
6          November, you sold eleven million dollars' worth of
7          work?

8     A    No.  Nine hundred and thirty-one thousand dollars
9          ($931,000) is what my spreadsheet shows.

10    Q    I'm sorry.  Nine hundred and thirty-one thousand
11         (931,000).  Okay.  You could have picked up the
12         phone and contacted Mr. Nelson after you learned
13         that you had been let go, but you didn't do that,
14         right?

15    A    Correct.

16    Q    So back to this bonus of ten thousand, two hundred
17         and thirty-two dollars and fifteen cents
18         ($10,232.15), you agree that the company paid that
19         only for employees who were still employed in
20         December or January, correct?

21    A    Well, employees and independent contractors, 'cause
22         this was paid to all of the sales reps who are non-
23         employee contractors.

24    Q    Okay.  With that clarification, you agree with me
25         that bonuses such as the one that you listed here

Stephen Halferty

45

| | | |
|---|---|---|
| 1 | | in Exhibit 1, Bonus YTD, that the company paid |
| 2 | | those only for independent contractors and |
| 3 | | employees who were still working for the company as |
| 4 | | of December or January, correct? |
| 5 | A | Correct.  Correct. |
| 6 | Q | And -- and you were terminated at the end of |
| 7 | | November, correct? |
| 8 | A | That's the -- that's my understanding.  Yes. |
| 9 | Q | All right.  Give me one second. |
| 10 | A | And Steve -- |
| 11 | Q | (Unintelligible.) |
| 12 | A | Stephen, I do have one -- one point to add.  So I |
| 13 | | did communicate with Mr. Nelson probably prior to |
| 14 | | the end of November asking if I was fired for |
| 15 | | taking the vacation that I requested, and there was |
| 16 | | no response.  So I was seeking clarification, and |
| 17 | | did not get any answer to that. |
| 18 | Q | Did you e-mail him or text? |
| 19 | A | That was a text. |
| 20 | Q | Have you saved all your text messages? |
| 21 | A | I believe so. |
| 22 | Q | Do you have any routine (unintelligible) |
| 23 | | destruction devices on your phone or computers? |
| 24 | A | No. |
| 25 | Q | Of this -- the 2021 compensation, one hundred and |

Stephen Halferty

52

```
 1    A     Right.  So these are just -- I did not enter
 2          religiously all of my -- all of my jobs that I
 3          didn't sell in the spreadsheet, because those
 4          weren't pertinent to the actual earnings, so these
 5          numbers aren't necessarily accurate.  But it was
 6          based on -- if I entered every appointment that I
 7          had gone on, then it would accurately measure the
 8          close rate and revenue per lead.  So I do have
 9          those calculated elsewhere in kind of 2021 -- in
10          October of 2021 sales documents that we've
11          provided.
12    Q     Explain that to me a little bit more.  You said you
13          didn't keep religiously track of this information?
14    A     Of the --
15    Q     These are estimates?
16    A     Yeah.  Of the jobs that I did not sell.  'Cause
17          those are the ones that would populate down to that
18          bottom table.  Because the jobs that I did not sell
19          did not factor into any owed commissions.
20    Q     Where do you get the one million, twenty-three
21          figure?
22    A     Again, that's -- it's some formula.  But, again,
23          the data in that table is not relevant to owed
24          commissions.
25    Q     Why did you list a forty-two percent close rate?
```

Stephen Halferty

53

```
 1              What is that?
 2      A       That's just a calculated formula based on the total
 3              number of sold jobs versus not sold jobs or versus
 4              total estimates run.
 5      Q       How does the sales figure of one million, twenty-
 6              three thousand (1,023,000) connect with the year-
 7              to-date sales figure of three-point-six-nine-seven
 8              (3.697) million on the right?
 9      A       These -- these would just be for -- for me.  I
10              mean, I don't -- I didn't track all of the other
11              reps' sales and commissions.
12      Q       Well, you said that you had nine hundred and
13              thirty-one thousand (931,000) in sales.  It said,
14              "Less Brad."
15      A       Correct.
16      Q       So why don't you have another figure of one-point-
17              oh-two-three (1.023) million in sales?
18      A       Correct.  That -- as I said, those -- those numbers
19              are not correct.  It's probably the only line that
20              is correct, because the data I had were just for
21              sales.  'Cause this was -- this was, as you can
22              imagine, a lot of work to create my own spreadsheet
23              to track every appointment that I've done.
24              Probably the average sale figure is correct, which
25              was relevant to the bonus payout, because I only
```

Stephen Halferty

73

```
 1       Q    You haven't looked at it since you left?
 2       A    I don't think there would be any reason to.  It was
 3            mainly used for daily sales reporting and kind of
 4            banter between salespeople.
 5       Q    Does Steve Nelson have access to it?
 6       A    No.
 7       Q    Who else does?
 8       A    Any of the other sales reps.
 9       Q    Any prior employees at EverSeal that you're aware
10            of?
11       A    Tim Lucero would have access to it, Michael Kelly
12            would have access to it, Michael Dailey, if all
13            those people are still there.  Terry, maybe.
14       Q    All right.  And they would be able to go back and
15            see what (unintelligible) in 2021.  Is that right?
16       A    Correct.  Yeah.  Back to the -- back to the start.
17       Q    So we were talking about why you created DuraSeal,
18            right?
19       A    Uh-huh (yes).
20       Q    And you allege that you told Mr. Nelson about some
21            of your concerns with DuraSeal while you still
22            worked there, right?
23       A    Correct.
24       Q    But you never told him that you had created
25            DuraSeal, right?
```

Stephen Halferty

74

```
 1      A     Correct.

 2      Q     You kept that a secret, didn't you?

 3      A     Correct.

 4      Q     And you did that because while you were still

 5            employed by EverSeal, you were also directing

 6            potential customers away from EverSeal to do work

 7            with DuraSeal, right?

 8      A     We were spending a lot on marketing to generate our

 9            own.  I think the claims that we were poaching

10            customers from EverSeal for DuraSeal is -- is off-

11            base.

12      Q     So if I look at your list of customers that you

13            produced to me two days ago on May 2nd in response

14            to our request for production of documents, I won't

15            find any of those same customers in the database at

16            EverSeal?

17      A     No.  You may find several customers that are the

18            same.  But that just means that they've, you know,

19            called two companies to get quotes.  So by the same

20            token, I would imagine that there are lots of

21            EverSeal customers that we've also quoted that

22            EverSeal won the projects for.

23      Q     And you went to work for EverSeal, giving Mr.

24            Nelson the impression that you were going to

25            dedicate your full time towards EverSeal, didn't
```

Stephen Halferty

77

```
 1              EverSeal, right?
 2    A         DuraSeal.  Correct.
 3    Q         Thank you for that clarification.  DuraSeal.  And
 4              up until -- up through the time that you continued
 5              to work for EverSeal when you were fired in
 6              November 2021 -- that entire time, you never told
 7              Mr. Nelson that you had created an entity
 8              (unintelligible) working for DuraSeal, right?
 9    A         Correct.
10    Q         And DuraSeal -- you've already testified just a few
11              minutes ago that some of DuraSeal's customers that
12              you sold jobs to were also potential customers of
13              EverSeal, right?
14    A         We had -- we had prospects in common, some of which
15              went to DuraSeal, some of which went to EverSeal.
16    Q         And there were some times when you would go out on
17              a sales pitch to potential customers that EverSeal
18              had generated for you and you would steer them to
19              DuraSeal, wouldn't you?
20    A         No.  That is not correct.  During the time that I
21              was representing EverSeal, I would never bring up
22              DuraSeal.  During the time in question, I ran over
23              four hundred appointments for EverSeal and was
24              still their top producer, you know, year-to-date,
25              including the full month of October.
```

Stephen Halferty

79

| | | |
|---|---|---|
| 1 | | understand you have a caveat that you spent money |
| 2 | | on advertising.  You were still employed by |
| 3 | | DuraSeal -- you were still employed by EverSeal |
| 4 | | until late November 2021, right? |
| 5 | A | Yes. |
| 6 | Q | And if any customer approached you that ultimately |
| 7 | | went to DuraSeal in that time period, you could |
| 8 | | have suggested that they do business with EverSeal, |
| 9 | | right? |
| 10 | A | But they were calling a tracking number to identify |
| 11 | | themselves as a DuraSeal prospect. |
| 12 | Q | I'm asking you you could have -- even if they had |
| 13 | | called the DuraSeal number, you could have |
| 14 | | suggested that they do business with EverSeal |
| 15 | | instead, right? |
| 16 | A | I -- I could have.  Yes. |
| 17 | Q | Okay.  And are you telling me that none of the |
| 18 | | customers that you have sold to since you began |
| 19 | | DuraSeal were generated by EverSeal? |
| 20 | A | There was one customer in Banner Elk that was |
| 21 | | listed in the complaint that was an initial |
| 22 | | EverSeal customer that EverSeal declined the job |
| 23 | | due to the customer's requirements for timing that |
| 24 | | was then brought to my attention and DuraSeal by |
| 25 | | Brad Perigo to see if we could do it so he could |

Stephen Halferty

82

1    parts of the agreement that you didn't agree with

2    and did not intend to honor, correct?

3  A  Correct.

4  Q  You didn't even tell my client at any point that

5    you had questions about a single word of that

6    confidentiality agreement, correct?

7  A  Correct.

8  Q  And you signed an agreement that said that it would

9    be in effect while you worked for him and for a

10    two-year period thereafter, right?

11  A  I believe so.

12  Q  Do you have any reason to question that?

13  A  No.  I mean, the only -- again, the only point that

14    I have is that I don't believe the language

15    precludes me from starting a business.  And I

16    believe that a noncompete and fiduciary duty does

17    not apply to an independent contractor who is not

18    an employee.

19  Q  But you didn't ever tell that to Mr. Nelson, did

20    you?

21  A  No.

22  Q  And Mr. Nelson did provide you with training before

23    you began working for him, didn't he?

24  A  Two days of training.

25  Q  Okay.  Tell me what those -- tell me what that

Stephen Halferty

93

| | | |
|---|---|---|
| 1 | A | That's just a market that we want to be in, and I |
| 2 | | think will do well with the service. |
| 3 | Q | Do you have any sales reps there? |
| 4 | A | I do not currently. |
| 5 | Q | How many employees has DuraSeal had from its |
| 6 | | creation 'til now?  And I know you said independent |
| 7 | | contractors, so I'm going to use those |
| 8 | | synonymously. |
| 9 | A | Yeah. |
| 10 | Q | How do you -- how do you -- go ahead. |
| 11 | A | Yeah.  Six, seven counting myself. |
| 12 | Q | And tell me their names. |
| 13 | A | So my name is Brad Halferty, Kevin Goggins, Tim |
| 14 | | Lucero. |
| 15 | Q | Who used to work at -- okay.  Keep going. |
| 16 | A | Yeah.  Daniel Simon. |
| 17 | Q | Daniel Simon? |
| 18 | A | Yeah.  And Robby Spehar, S-P-E-H-A-R, and Donnavan |
| 19 | | Blue, D-O-N-N-A-V-A-N Blue, B-L-U-E.  Luis -- Luis |
| 20 | | Cruz was another subcontractor installer. |
| 21 | Q | Anyone else? |
| 22 | A | Bailey Morlidge. |
| 23 | Q | How do you spell that last name? |
| 24 | A | M-O-R-L-I-D-G-E. |
| 25 | Q | Kevin Goggins and Tim Lucero you met through |

Stephen Halferty

94

```
 1              EverSeal, right?

 2    A    Correct.

 3    Q    Does Kevin Goggins still work for you?

 4    A    Yes.

 5    Q    He's a sales rep?

 6    A    Correct.

 7    Q    In other words, is that an estimator?

 8    A    In other words, as an estimator?  Yes.

 9    Q    Is another word for that "estimator"?

10    A    Yes.

11    Q    And Tim Lucero was also a sales rep or estimator?

12    A    Correct.

13    Q    He no longer works for you, right?

14    A    Correct.

15    Q    When is the last time you spoke with him?

16    A    Probably January.  Well, probably December of last

17         year, 2021.

18    Q    Why did you talk with him?

19    A    He was intending to move to Tampa to assist with

20         the launch of that market.

21    Q    What happened?

22    A    I'm not exactly sure.  I know he went back to

23         working with EverSeal.

24    Q    What is Daniel Simon's role?

25    A    He was production manager.  No longer with the
```

Stephen Halferty

95

| | | |
|---|---|---|
| 1 | | company. |
| 2 | Q | Does that mean that -- what did his job entail? |
| 3 | A | Scheduling -- scheduling projects, making sure |
| 4 | | customers were happy with the process. |
| 5 | Q | Robby Spehar, what is his title? |
| 6 | A | He's an installer. |
| 7 | Q | Donnavan Blue? |
| 8 | A | Installer. |
| 9 | Q | You said Luis Cruz was an installer? |
| 10 | A | Yeah. |
| 11 | Q | And Bailey Morlidge? |
| 12 | A | Estimator, sales rep. |
| 13 | Q | You had at least two jobs in Apex, North Carolina |
| 14 | | for DuraSeal? |
| 15 | A | (Nods head.) |
| 16 | Q | Jobs also in Banner Elk, correct? |
| 17 | A | Yeah. |
| 18 | Q | Cary? |
| 19 | A | Yeah. |
| 20 | Q | Clayton? |
| 21 | A | Yes. |
| 22 | Q | Fuquay-Varina? |
| 23 | A | Yes. |
| 24 | Q | Garner? |
| 25 | A | Yes. |

Stephen Halferty

96

| | | |
|---|---|---|
| 1 | Q | Holden Beach? |
| 2 | A | Yes. |
| 3 | Q | Lake Waccamaw? |
| 4 | A | Yes. |
| 5 | Q | Leland? |
| 6 | A | Yes. |
| 7 | Q | Oak Island? |
| 8 | A | Yes. |
| 9 | Q | Raleigh? |
| 10 | A | Yes. |
| 11 | Q | Sherrills Ford? |
| 12 | A | Yes. |
| 13 | Q | Supply? |
| 14 | A | Yes. |
| 15 | Q | Wake Forest? |
| 16 | A | Yes. |
| 17 | Q | Willow Springs? |
| 18 | A | Yes. |
| 19 | Q | Youngsville? |
| 20 | A | Yes. |
| 21 | Q | Garner? |
| 22 | A | Yes. |
| 23 | Q | And then South Carolina in Greenville and Taylors, |
| 24 | | right? |
| 25 | A | Yes. |

Stephen Halferty

120

1           is that you don't know where that comes from?

2      A    Correct.  I believe if we were to put the EverSeal

3           original sales presentation to this degree of

4           scrutiny that we will find, you know, numerous

5           other problems.  But I believe that comes from my

6           understanding from EverSeal that the manufacturer

7           stands behind their product with a twenty-five-year

8           warranty.

9      Q    So you gained this knowledge when creating Page 85

10          from your work at EverSeal, right?

11     A    Specifically the manufacturer's warranty, yes.

12     Q    How about the (unintelligible) by three hundred

13          percent?

14     A    That is -- that's in the installation instructions.

15     Q    From SealIt?

16     A    Correct.

17     Q    Who is your main contact?  Ray Schmidt [phonetic]

18          at SealIt?

19     A    Correct.

20     Q    Any others?

21     A    He's really the only one I talk to when placing

22          orders or if I have customer questions that I don't

23          know the answer to.

24     Q    Your primary sales territory when you worked at

25          EverSeal was a one-hundred-mile radius from

Stephen Halferty

121

```
 1              Raleigh, North Carolina, correct?
 2     A        It included the whole state of North Carolina, so I
 3              was running to Asheville on occasion and Charlotte.
 4              I think Charlotte is farther than a hundred miles.
 5     Q        And you also worked for EverSeal outside of North
 6              Carolina in other states, right?
 7     A        I went to Nashville for one week of appointments.
 8              I went to Atlanta for -- I don't even know that
 9              that was a full week of appointments.  I think that
10              was a day of appointments when Michael Dailey was
11              out sick or something.  I had one referral customer
12              from EverSeal that lived in Raleigh that had a
13              project in Indiana.
14     Q        Kentucky?
15     A        No.
16     Q        Virginia?
17     A        I think I had one -- one lead and customer from
18              Virginia.
19     Q        South Carolina?
20     A        Greenville, South Carolina towards the end of my
21              Charlotte runs.
22     Q        Do you know what level of PSI you install the
23              sealer?
24     A        I believe -- I believe the manufacturer's
25              instructions are thirty to fifty.
```

Stephen Halferty

125

| | | |
|---|---|---|
| 1 | Q | You could have read every word?  Whether you did or |
| 2 | | not, you could have read every word before you |
| 3 | | signed it.  It's only two pages, right? |
| 4 | A | Correct. |
| 5 | Q | And it includes a twenty-four-month noncompete |
| 6 | | provision, right? |
| 7 | A | Correct. |
| 8 | Q | And so your position is that it's unreasonable |
| 9 | | because it prevents you from doing what you did -- |
| 10 | | it prevents you from doing painting or -- or what? |
| 11 | A | Yeah.  Any -- any indirect competition for |
| 12 | | EverSeal. |
| 13 | Q | But you're in direct competition with EverSeal, |
| 14 | | aren't you? |
| 15 | A | Well, it lists direct and indirect. |
| 16 | Q | And you are in direct competition -- DuraSeal is in |
| 17 | | direct competition -- |
| 18 | A | Correct. |
| 19 | Q | -- with EverSeal, correct? |
| 20 | A | Yes. |
| 21 | Q | But it's unreasonable because it also prohibits you |
| 22 | | from indirectly competing.  Is that right? |
| 23 | A | Correct. |
| 24 | Q | And you're not indirectly competing, are you? |
| 25 | A | No. |